Stephen DASH, Mance Sewell, Alvin M. Webb, Edilberto Chaparro, Joseph F. Cole, Andrew C. Pulley, Hubert L. Gilliard, Eugene J. Rudder, Curtis E. Mays and Joseph Miles, Plaintiffs,

v.

The COMMANDING GENERAL, FORT JACKSON, SOUTH CAROLINA, and Secretary of the Army, Washington, D. C., Defendants.

Civ. A. No. 69–303.

United States District Court
D. South Carolina,
Columbia Division.

Dec. 19, 1969.

Washington, D. C., and Howard Moore, Jr., Atlanta, Ga., for plaintiffs.

Joseph O. Rogers, Jr., U. S. Atty., Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., and Arnold I. Melnick, LTC, JAGC, (of counsel), Fort Jackson, S. C., for defendants.

## OPINION and ORDER

DONALD RUSSELL, District Judge.

This is an action for a declaratory judgment. The plaintiffs were at the time of the commencement of the action non-commissioned servicemen stationed at Fort Jackson, South Carolina. Their action is filed not only on their behalf but also on behalf of all enlisted personnel at such base and seeks a declaration of their constitutional rights of free speech under the Federal Constitution.

The record refers to a number of constitutional rights, which the plaintiffs claim the defendants, the Commander of the Post, and the Secretary of the Army, violated. For purposes of this proceeding, however, the plaintiffs, through their counsel, limit their claim of constitutional deprivation to two matters:[1] (1) The regulation of the Post Commander, restricting the distribution of published materials on post; and (2) The refusal of the Post Commander to grant the plaintiffs' request to have a public, open meeting on base for the free discussion of the Vietnam war and other complaints connected therewith, as requested by a petition presented to such commander.

The circumstances that gave rise to this controversy are not disputed. They were established either by stipulation of facts or by evidence taken before me.

Thomas Broadwater, Columbia, S. C., Leonard B. Boudin, Dorian Bowman, New York City, Rabinowitz, Boudin & Standard, New York City, David Rein,

---

1. See pp. 44–6, Transcript;

"*Mr. Rein*: \* \* \* We are talking solely of First Amendment rights in the very classic sense: the right to speak, the right to publish, the right to hold meetings, and the right of assembly.

"*The Court*: And is it the right of free speech as expressed in the right to hold that particular meeting?

"*Mr. Rein*: Yes \* \* \*." P. 39, Transcript.

Again, speaking to the claims of the plaintiffs other than the two stated above, counsel for the plaintiffs stated at the conclusion of his argument:

"*Mr. Rein*: I'm not asking your Honor to set aside or give relief in these cases, because I consider that would be appropriate for separate proceedings." P. 46, Transcript.

On the basis of such record so established, both parties seek summary judgment, contending rightly that, basically, the issue is one of law, involving the constitutional rights of servicemen.

The plaintiffs—or, at least, some of them—prepared and distributed a petition requesting the Post Commander to allow them to have an open, public meeting on base for the purpose of "freely discuss(ing) the legal and moral questions related to the war in Vietnam and to the civil rights of American citizens both within and outside the armed forces." The petition stated it to be their "intention to hold a peaceful, legal meeting open to any enlisted man or officer at Fort Jackson." They professed a desire "only to exercise the rights guaranteed to us as citizens and soldiers by the First Amendment to the U. S. Constitution." Some twelve non-commissioned servicemen signed such petition. It was presented at the office of the Post Commander, who, through an aide, refused to accept it, stating that the Army did not engage in "collective bargaining". Some days before this, an impromptu open discussion of the Vietnam war was held outside the quarters occupied by a number of the plaintiffs. In this discussion, a substantial number of servicemen took part. Considerable acrimony developed; threats were exchanged; fighting began; officers were disobeyed; and complete disciplinary control of the servicemen was for a time lost.

The Post Commander prior to the commencement of this action, issued a regulation limiting the right to distribute pamphlets on the base. This regulation, the validity of which is challenged by the plaintiffs, is as follows:

"Distribution of publications such as books, periodicals, pamphlets, handbills, flyers, advertisements, and similar printed material at Fort Jackson may not be made except through regularly established and approved distribution outlets unless prior approval is obtained from the installation commander or his authorized representative. Approved outlets are the Post Exchange and its branches, the Post Library, and the official offices and designated agencies of the installation. Individuals desiring to distribute unofficial publications of any kind within the reservation will submit copies to G1 for approval by the Commanding General prior to effecting dissemination."

So far as the record indicates, none of the plaintiffs had been denied the right to distribute any pamphlet on base. In fact, there is no showing that the Post Commander had ever exercised his authority under this regulation.

Since the commencement of this action, all of the plaintiffs have either been released by the Army or been transferred to other bases.

The defendants contend, *in limine*, (1) that, since the real plaintiffs concerned with a violation of alleged constitutional rights have either been discharged or transferred to other posts the proceeding is moot, and (2) that the plaintiffs have failed to exhaust their military remedies and that, absent such exhaustion, jurisdiction does not vest in this Court.

■ Neither preliminary objection raised by the defendants is, in my opinion, meritorious. The issues posed are continuing ones, involving restraints not alone on the plaintiffs but on all non-commissioned personnel, present or future, at the base. If, by either the release or transfer of the plaintiffs, the power of the Court to resolve such issues could be destroyed, the rights asserted by the plaintiffs might never be determined since the defendants, who control such releases or transfers, could effectively prevent a review of their actions. Under such circumstances where the problem is "capable of repetition, yet evading review", the mere transfer or release of all or a part of the plaintiffs will not render the proceedings moot. Moore v. Ogilvie (1969) 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1; cf., Hall v. Beals (1969) 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214, filed November 24, 1969.

■ Similarly, *it is obvious that there* is no recourse for the plaintiffs within the military hierarchy. The plaintiffs, for all practical purposes, have exhausted every administrative remedy available to them within the military. Further action in this regard would be futile in any attempt by the plaintiffs to assert First Amendment rights. The courts are appropriately available to them now for the vindication of such rights, if rights they have. See, United States ex rel. Brooks v. Clifford (4th Cir. 1969) 409 F.2d 700, rehearing denied 409 F.2d 700.

Turning to the merits of this controversy:

■ At the outset it should be noted that a serviceman's right of free speech is not absolute.[2] With his induction into military service, he "necessarily accepts some abridgment of his right of free speech."[3] Thus, in a recent attempt to order and rationalize existing decisions interpreting the First Amendment, a thoughtful commentator explicitly refrained from incorporating the military into the general scheme of such rights, remarking that, "To a certain extent, at least, the military sector or society must function outside the realm of democratic principles, including the principle of freedom of expression" and, "Certainly, members of the armed forces, at least when operating in that capacity, can be restricted in their right to open discussion."[4] This is true because, as the Supreme Court has put it, "The military constitutes a specialized community governed by a separate discipline from that of the civilian."[5] It has been aptly observed that, "An army is not a deliberative body,"[6] and, it may be added, it cannot function as a debating society. "Its law is that of obedience" and discipline, and its strength lies in "Vigor and efficiency on the part of the officer, and confidence among the soldiers * * *."[7] As a recent decision phrases it, "The need for discipline (in the Army), with the attendant impairment of certain rights, is an important factor" in the operation of an Army.[8]

■ To say that a serviceman's right of free speech is limited is not an entirely anomalous principle. Even among civilians, the right of an individual to exercise First Amendment rights may be legally circumscribed by the character of his public employment or by the circumstances, place and time where the right is sought to be exercised.[9] Accordingly, in Pickering v. Board of Education (1968) 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811, the Court said, "At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." See, also, United Public Workers of America (C.I.O.) v. Mitchell (1947) 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754. And, in Goldwasser v. Brown (D.C. Cir. 1969) 417 F.2d 1169, filed September 17, 1969, a civilian employee of the Air Force, discharged as a teacher because of comments made in the classroom to foreign officers on the Vietnam war,

2. Callison v. United States (9th Cir. 1969) 413 F.2d 133, 135–136.

3. Special Preparedness Subcomm. of the Sen. Comm. on Armed Services, Military Cold War Education nad Speech Review Policies 3 (Comm.Print 1962), cited in 81 Har.L.Rev. 1743, note 273.

4. Emerson, Toward a General Theory of the First Amendment, 72 Yale L.Journal, 877 (1963).

5. Orloff v. Willoughby (1953) 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842, reh. den. 345 U.S. 931, 73 S.Ct. 779, 97 L. Ed. 1360.

6. In re Grimley (1890) 137 U.S. 147, 153, 11 S.Ct. 54, 34 L.Ed. 636.

7. In re Grimley, *supra*, at p. 153, 11 S.Ct. at p. 55 (137 U.S.).

8. Raderman v. Kaine (2d Cir. 1969) 411 F.2d 1102, 1104.

9. Callison v. United States, *supra* (413 F. 2d, p. 136).

assailed his discharge as a violation of his First Amendment rights. In denial of such claimed violation, the Court said:

"We would also be blinking reality if we did not recognize that a class of foreign military officers at an Air Force installation on invitational orders presents special problems affecting the national interest in harmonious international relations. We are certainly not equipped to second guess the agency judgment that the instructional goals of the Air Force program would be jeopardized by the teacher's volunteering his views on subjects of potential explosiveness in a multi-cultural group."

Moreover, "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." [10] In short, where First Amendment rights are involved, whether of civilian or serviceman, the issue always involves the balancing by the Courts of the competing private and public interests at stake in the particular circumstances.[11]

■ It does not follow, however, that, contrary to certain early judicial expressions,[12] First Amendment rights are completely inapplicable to servicemen. Indeed, the Court of Military Appeals, applying as it understood the decision in Burns v. Wilson (1953) 346 U.S. 137, 73 S.Ct. 1045, 91 L.Ed. 1508, has held that "servicemen have all the protections of the Bill of Rights except such as are expressly or by necessary implication not applicable by reason of the peculiar circumstances of the military." [13] But the Courts have been understandably loath to overturn military decisions where military personnel is concerned. After all, it is not the function of courts to "regulate the army" [14] and "judges are not given the task of running the Army." [15] Courts must be "scrupulous not to interfere with legitimate Army matters" [16] and are required to give "a substantial degree of civilian deference to military tribunals. In reviewing military decisions," the Courts "must accommodate the demands of individual rights and the social order in a context which is far removed from those which" the Courts "encounter in the ordinary run of civilian litigation, whether state or federal. In doing so", the Courts "must interpret a legal tradition which is radically different from that which is common in civil courts." [17] Chief Justice Warren in The Bill of Rights and the Military, 37 N.Y. Univ.L.Rev. 181, 186–7 (1962) has stated the proper judicial role in this connection thus:

"So far as the relationship of the military to its own personnel is concerned, the basic attitude of the Court has been that the latter's jurisdiction is most limited. * * *

"This 'hands off' attitude has strong historical support, of course. While I

---

10. Cox v. Louisiana (1965) 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471; Adderley v. Florida (1966) 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed.2d 149, note 7.

11. See Kester, in 81 Har.L.Rev. 1752, and Emerson, *supra*, at p. 912.
See, also, Fried, Two Concepts of Interests: Some Reflections on the Supreme Court's Balancing Test, 76 Har.L.Rev. 755 (1963).

12. Ex Parte Milligan (1866), 4 Wall. 2, 71 U.S. 2, 138, 18 L.Ed. 281; Reaves v. Ainsworth (1911) 219 U.S. 296, 304, 31 S.Ct. 230, 55 L.Ed. 225; Miller, A Long Look at Article 15, 28 Mil.L.R. 37, 47.

13. Miller, A Long Look at Article 15, 28 Mil.L.R. 37, 48–9; United States v. Voorhees (1954) 4 U.S.C.M.A. 509; United States v. Jacoby (1960) 11 U.S. C.M.A. 428.

14. Reaves v. Ainsworth, *supra* (219 U.S. p. 306, 31 S.Ct. 230).

15. Orloff v. Willoughby, *supra* (345 U.S. p. 93, 73 S.Ct. p. 540).

16. Orloff v. Willoughby, *supra* (345 U.S. p. 94, 73 S.Ct. p. 540).

17. Noyd v. Bond (1969) 395 U.S. 683, at p. 694, 89 S.Ct. 1876, 1883, 23 L.Ed.2d 631.

cannot here explore the matter completely, there is also no necessity to do so, since it is indisputable that the tradition of our country, from the time of the Revolution until now, has supported the military establishment's broad power to deal with its own personnel. The most obvious reason is that courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have."

There are few instances of a judicial application of these rules in a context similar to that posed by the plaintiffs. In United States v. Bradley (4th Cir. 1969) 418 F.2d 688, filed November 28, 1969, which involved a distribution of hand bills on an army post *but not by servicemen*, the Court decided the case on other grounds and found it "unnecessary to decide constitutional questions raised". It is unlikely, however, that the Court would have found the rights of a serviceman on post identical with that of a civilian, even though on post. In Callison v. United States, *supra*, a draftee, in process of induction, sought to induce other inductees at the induction center to sign a petition opposing the draft and the war in Vietnam. Ordered to desist, he disobeyed, claiming the right to distribute his petition under the First Amendment. The Court held that "the order to refrain from soliciting signatures was not an impermissible intrusion upon appellant's First Amendment rights and was entitled to respect and obedience." 413 F.2d at p. 135. Professor Kester, in 81 Har.L.Rev. 1697, "Soldiers Who Insult the President: An Uneasy Look at Article 88 of the Uniform Code of Military Justice" (1968), was commenting critically on a case [18] in which the offensive remark about his Commander in Chief made by a commissioned officer found violative of Article 88 [19] was made off base "isolated from any military audience and was found by the Court of Military Appeals without constitutional protection" (page 1768, 81

Har.L.Rev.). He was particular to note, however, that, "A post commander's restriction on public statements after increased discipline problems caused by public dissent by his personnel might be constitutionally acceptable" (pp. 1764–5, 81 Har.L.Rev.). Actually, he suggested that Article 88 which forbids contemptuous words spoken of the President by a serviceman, "should be redrafted to exclude specifically all utterances but those published or *made to public gatherings*, or those made not in ordinary conversation but in an unsolicited effort to proselytize military personnel." (p. 1766, 81 Har.L.Rev.) Italics added. The author's criticism centered on the place where questioned statement was made, i. e., *off post* and *to an almost wholly non-military audience*. Goldwasser, to which reference has heretofore been made and in which no infringement of free speech rights was found, involved criticisms leveled at our involvement in Vietnam made within the classroom by a civilian employee of the Defense Department, serving as a language instructor for foreign military personnel being trained in this country.

■ Despite the absence of any specific decisional authority on our specific issues, it would appear plain from the foregoing general principles that, within certain limits, the military establishment should have authority to restrict both the distribution of printed materials and the holding of public discussion meetings on post. The right to restrict, however, must no doubt be kept within reasonable bounds; it is not, and cannot be, a completely limitless power. And, however hesitant they may be to "intrude", Courts will be available to determine whether there is a reasonable basis for such restrictions as may be placed on the serviceman's right of free speech by the military establishment.

■■ The restriction placed on the distribution of printed material at Fort Jackson (T.C.Reg. 600–50), to which the

18. United States v. Howe, 17 U.S.C.M.A. 165, 37 C.M.R. 429.

19. Art. 88, Section 888., 10 U.S.C.A.

plaintiffs direct their first challenge, may be, as plaintiffs argue, broad and indefinite; it does not incorporate within itself any plain standards by which a pamphlet's acceptability for distribution may be adjudged. The regulation must be read, however, in conjunction with the opinion of the Judge Advocate instructing authoritatively the Post Commander in the exercise of his powers under AR 210–10, paragraph 5–5e. By these instructions, the Post Commander is required to make specific findings in support of any restriction imposed by him under the Regulation. Specifically, he is advised against any denial based on "good taste" or "in the best interests of the command" and is instructed that he may delay distribution of a publication "only if he determines that the specific publication presents a clear danger to the loyalty, discipline, or morale of his troops." He is commanded that he "may not prevent distribution of a publication simply because he does not like its contents" and "The fact that a publication is critical—even unfairly critical—of Government policies or officials is not in itself, a ground for denial." [20] The constitutionality of the regulation must be determined on the regulation as construed and defined in these instructions issued by the Judge Advocate, controlling the application by the Post Commander of the regulation. See the concurring opinion of Justices Black and Douglas in Gregory v. City of Chicago (1969) 394 U.S. 111, 113, 89 S.Ct. 946, 22 L.Ed.2d 134, and concurring opinion of Justice Harlan in Shuttlesworth v. City of Birmingham (1969) 394 U.S. 147, at p. 159, 89 S.Ct. 935, 22 L.Ed.2d 162. So limited and defined, the challenged Regulation would appear to be within the authority of the Post Commander. Whether the Post Commander, in the exercise of his authority under the Regulation as limited and defined by the commands of the Judge Advocate, acts arbitrarily or capriciously, without proper justification, in a particular instance is a question which will arise when the Post Commander has exercised his authority under the Regulation. So far as the record shows, he has never exercised the authority to restrict the distribution of any printed material. What is involved in this proceeding, so far as distribution of printed material is concerned, is the bare right of the Post Commander, in those cases where there is a reasonable basis for the conclusion that the distribution represents "a clear danger to the loyalty, discipline, or morale of his troops," to prohibit the distribution of such printed material. I find he has such power. As I have said, however, whether he has properly exercised such power in a particular situation is an issue that can only be resolved when that situation arises.

■■■ It is urged by the plaintiffs that, even if the challenged regulation be limited as the Judge Advocate has ruled, it still is too vague to meet constitutional requirements. In support of this contention, they rely on *Shuttlesworth, supra.* That case, however, involved a criminal ordinance and dealt with the rights of a civilian seeking to exercise his constitutional rights on the public streets. Here, on the other hand, we are dealing with a military regulation governing conduct on a military training base. It seems settled that the Courts do not require the same precision and specificity of standards in military regulations as in a criminal statute.[21] Actually, language very similar to that used in the Judge Advocate's instructions was sustained against constitutional attack in Cafeteria and Restaurant Workers Union, Local 473, A.F.L.-C.I.O. v. McElroy (1961) 367 U.S. 886, 894–896, 81 S.Ct. 1743, 6 L.Ed.2d 1230. The regulation in that case, which was upheld, phrased the Commander's

---

20. See, General Release, Office of The Adjutant General, Department of the Army, dated May 28, 1969, Subject: Guidance on Dissent and issued by Order of the Secretary of the Army.

21. See, 81 Har.L.Rev. at p. 1751.

authority in the terms of "good order and military discipline". (p. 893, 81 S.Ct. 1743) In Weissman v. United States (10th Cir. 1967) 387 F.2d 271, 274, the action of the Post Commander was based on a finding that the conduct was "prejudicial to good order and discipline"; it was sustained against attack. As a matter of fact, the language used by the Judge Advocate in marking out the limits of the regulation seems as clear as the circumstances admit. Of course, the power under such regulation may be abused. Should the Post Commander be unable to show any possible reasonable basis for his determination, remedies are available for redress in the Courts. But there is, as I have said, no contention that the power has been so abused; the attack is on the power to restrict. That attack, in my opinion, must fail.

█ Likewise, the Post Commander has the authority, in a proper case, to deny servicemen under his command the right to hold on post public meetings. So much, Professor Emerson, in his scholarly and exhaustive discussion of the constitutional right of free speech in 72 Yale L.Journal 936, quoted *supra* recognizes. Again, though, this power must be exercised only where it is reasonably possible that the meeting might represent "a clear danger to military loyalty, discipline or morale of the military personnel" at the post. Moreover, Courts have both the responsibility and the duty to interfere where such power is exercised, either arbitrarily or capriciously, without a proper basis. Accordingly, the question becomes: Did the Post Commander have a proper basis for denying the petition for an open, public meeting and discussion on post?

It is the position of the defendants that the very nature of the subjects to be discussed at the meeting, taken in conjunction with the known views of the promoters of the meeting, warrants the conclusion that the meeting would have created unrest, provoked disorder and weakened discipline and morale among the military personnel at the base.

█ While the plaintiffs assert the purpose of the meeting was to discuss peaceably the justification of the Vietnam engagement and the right of the Post Commander to abridge such right of discussion, their own view of the issue to be discussed was plain: To them, the Vietnam war is an immoral war, engaged in wrongfully and carried on inhumanely. It must be assumed that a meeting, promoted by the plaintiffs, would seek to develop and expound that thesis. Can it be disputed that such a meeting, held on post and directed particularly at servicemen being trained to participate in that very war, would likely be calculated to breed discontent and weaken loyalty among such servicemen? Can training for participation in a war be carried on simultaneously with lectures on the immorality or injustice of such war? In my opinion, the denial of the right for open, public meetings at advertised meetings on post for discussion of the propriety of the political decision to participate in the Vietnam war was justified ."by reason of the peculiar circumstances of the military" and represented no infringement of the constitutional rights of the plaintiffs or others similarly situated. Off base, as parts of the great mass of our nation's citizenry, they may well be entitled to First Amendment rights, they should no doubt be granted the right of all other citizens to exercise the freedom to dissent and to criticize. This right was stated and upheld in the instructions of the Judge Advocate, already cited. But to organize meetings on base, to seek to create of and within the military itself a cohesive force for the purpose of compelling political decisions—and political decisions directly related to the mission of the military itself—would undermine civilian government, especially civil control of the military, and would take from responsible civilian government the power of decision. And this plainly was the purpose of the meeting sought by the plaintiffs. They sought to generate, through their meeting, such discontent with the Vietnam war among servicemen that the po-

litical decision to involve this nation in such war might be influenced, if not reversed. This they may have a constitutional right to do off base and as individual citizens, despite the fact that they were members of the armed services. But this is quite different from their right to organize on base among military men meetings to promote discontent with their military responsibilities and tasks.

Moreover, the defendants offered proof that an impromptu open meeting, created by some of the plaintiffs and providing an opportunity for the discussion on base of the very subjects sought to be discussed at the public meeting solicited in the petition of the plaintiffs, had created disorder, fomented dissension, and given rise to serious breaches of discipline. Such evidence clearly demonstrated the reasonableness of the Post Commander's action.

The plaintiffs, citing Tinker v. Des Moines Independent Community School Dist. (1969) 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, and like cases, however, would liken their claim of a constitutional right to hold such meetings on post to the right of college or school students to have such meetings on school premises. It should be noted at the outset that, in the *Tinker Case*, the Court was careful to point out that "the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," as a result of permitting the plaintiff to wear an armband during school hours indicating his opposition to the war in Vietnam. (393 U.S. at p. 514, 89 S.Ct. at 740) In fact, the single question posed in the petition for certiorari that case limited the claim of First Amendment right to acts "not disruptive of school discipline or decorum".[22] Such is clearly not the case here. The events of the impromptu open meeting provide a reasonable basis for concluding that such a meeting as that proposed by the plaintiffs, held on post, would be "disruptive" of discipline and interfere with the military functions of the base. Moreover, there is a fundamental difference between both the role and the operations of a military training base and a school or college. At the military base, the serviceman's training is in discipline and obedience. The school or college, on the other hand, is, to quote the language of the Court in Keyishian v. Board of Regents (1967) 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629, "peculiarly the 'market-place of ideas'." It is a place for free and unrestricted inquiry, for the discovery of truth through open discussion and the frank dissection of conflicting viewpoints. Commenting on the *Tinker Case*, the editors in 83 Har.L.Rev. 159, put it that schools are places for "open, vigorous, disputations, disturbing" discussions and speeches—certainly not an apt description of a military training base. Because of the obvious differences both in purposes and in necessary operations, it is thus clear that the rules applicable to conduct in a military base and in a school or college must be and are entirely different and that authorities sustaining First Amendment rights of students are inapplicable to the determination of the rights of servicemen on base.

It is, therefore, my opinion that the motion of the defendants for summary judgment should be granted, and

It is so ordered.

22. See dissenting opinion of Justice Black, p. 515, note 1, of 393 U.S., p. 741 of 89 S.Ct.