Michael B. ANDERSON, Cadet, U.S.A.,
 et al., Plaintiffs,
 v.
Melvin R. LAIRD et al., Defendants.
 Civ. A. No. 169-70.

 United States District Court,
 District of Columbia.
 July 31, 1970.

Warren K. Kaplan, Washington, D. C., for plaintiffs; Lawrence Speiser, American Civil Liberties Union, Washington, D. C., and Melvin Wulf, American Civil Liberties Union, New York City, of counsel.

Thomas A. Flannery, U. S. Atty. for District of Columbia, and Joseph M. Hannon, Asst. U. S. Atty. for District of Columbia, for Government; John A. McIntire, Washington, D. C., for Department of Defense and Department of the Navy, Robert K. Weaver, Colonel, United States Army, Office of Judge Advocate General, and C. Claude Teagarden, Major, United States Air Force, Office of Judge Advocate General, of counsel.

## OPINION AND ORDER

CORCORAN, District Judge.

### I.

### GENERAL STATEMENT

Plaintiffs, two cadets of the United States Military Academy and nine midshipmen [1] of the United States Naval Academy, brought this suit as a class action on behalf of all cadets and midshipmen [2] at the United States Military Academy at West Point, New York, the United States Naval Academy at Annapolis, Maryland, and the United States Air Force Academy at Colorado Springs, Colorado.[3] The defendants are the Secretary of Defense and the Secretaries of the Army, Air Force, and Navy.

Plaintiffs claim that the regulations of the Academies compelling Sunday attendance at Catholic, Protestant, or Jewish chapel service violate the Establishment/Free Exercise Clauses of the First Amendment and constitute a "religious test" in violation of Article VI of the Constitution. They urge that such compulsory attendance is contrary to the Supreme Court's declarations limiting governmental actions involving religion because compulsory attendance constitutes religious proselytizing and governmental support of religion. They also urge that mandatory attendance constitutes an establishment of religion and an interference with plaintiffs' free exercise of religion. Plaintiffs seek (1) a declaratory judgment that compulsory church or chapel attendance violates the above noted provisions of the Constitution, and (2) a permanent injunction forbidding the Academies from enforcing the regulations and from disciplining those cadets involved in this court action.

The applications for preliminary and permanent injunction were heard on a consolidated basis. The Court first took testimony and heard argument on whether the plaintiffs had exhausted their administrative remedies within the Academies before filing suit. The Court ruled that adequate and effective administrative remedies were not available and hence that the exhaustion doctrine was not available as a defense. Thereafter the Court completed testimony on the merits and took the case under advisement.

For the reasons appearing below the Court holds that the regulations requiring mandatory church or chapel attendance on Sunday violate neither the First

1. Most midshipmen were minors and appeared through the Reverend Father Robert F. Drinan as "next friend." The defendants challenged the right of Father Drinan to appear for the minors absent a showing that the parents of the minors had been consulted and consented to such an appearance. Since the Court had ruled that the action was a class action it deemed the challenge immaterial and denied the motion to strike Father Drinan's appearance as next friend.

2. The term "cadets" is hereinafter used to include not only the cadets at the West Point and the Air Force Academies but the midshipmen at Annapolis as well.

3. None of the named plaintiffs was a cadet at the Air Force Academy. The similarity of regulations at the three Academies and the similarity of cadet positions at each Academy brings the Air Force Academy within the confines of this suit held to be a class action pursuant to Rule 23 F.R.Civ.P. See Class Actions, Charles Alan Wright, 47 F.R.D. 169, 172, 174, 178 (1969).

Amendment to nor Article VI of the Constitution of the United States.

## II.

### THE CHAPEL REQUIREMENTS

There is no question that Sunday church or chapel attendance is required by all cadets attending the three service Academies.[4]

The West Point regulation provides: "Attendance at Chapel is part of a cadet's training; no cadet is exempt. Each cadet must attend either the Cadet Chapel, Catholic Chapel or Jewish Chapel service on each Sunday, according to announced schedules." Regulations for the United States Cadet Corps of the United States Military Academy, Chapter 8, Section IV, paragraph 819.

Air Force Regulation No. 265–1 provides:

"Attendance at an established church service is mandatory for those Second, Third and Fourth Classmen present for duty in the Cadet area."

Part II, Chapter 15, of the United States Naval Academy Regulations states:

"1. The basic requirements concerning religious matters at the Naval Academy are:

(a) All Midshipmen will attend church or chapel services on Sunday mornings but are required to attend at no other times."

Violations of these regulations are punished in the same manner as violations of other regulations, i. e., by reprimands, demerits, punishment marching tours, confinement to quarters, and for repeated violations, expulsion.

There are slight variations in the respective Academy Regulations concerning alternative worship services available. At West Point, all cadets are required to attend one of the three services on the Academy premises, as there is no town nearby to provide other alternatives. At the Naval Academy, midshipmen are permitted to attend a denominational service in Annapolis in lieu of the Academy church or chapel service. At the Air Force Academy, a cadet may attend church in Colorado Springs which has been approved by the Senior Chaplain.

Cadets may change their regular attendance from one church or chapel service to another only after first securing the approval of the respective chaplains involved, and, if they are under twenty-one, the approval of their parents. The cadet must demonstrate a sincere desire to affiliate with the new church. Approval of requests to change chapel squads is not granted on a mere personal whim any more than requests to change muster, classes or meals.

However, a cadet who has sincerely held convictions against church or chapel attendance itself may be excused from such attendance. It was so declared by the Superintendents of the Academies in April 1969 in a policy statement which said:

"It is understood that intelligent provisions must be made for bona fide cases where attendance would be in conflict with sincerely held convictions of individual cadets or midshipmen."[5]

Thus when the effect on the individual cadet is opposite to that intended, i. e., when he becomes incapable of observing, assimilating or becoming involved with an understanding of the religious beliefs

4. Nor is there any question that prospective candidates for the service Academies, volunteers all, are on notice as to the behavior expected of them if accepted as officer candidates—including the requirement to attend Sunday services. They are so notified through the catalogs distributed to them when they apply. It might well be argued that the cadets by

their own choice have imposed restrictions on their activities at the Academies. See Raderman v. Kaine, 411 F.2d 1102, 1104 (2nd Cir. 1969).

5. The Eleventh Conference of Superintendents of the Academies of the Armed Forces, Record of Proceedings, April 18, 1969 at 32.

of men and finds himself turning away from an understanding of what their religious belief and value systems are, then he is relieved from the attendance requirement.

The requirement of attendance at Sunday services at the service Academies reaches for its origins far back into the nineteenth century. West Point established its requirement as early as 1821; the Annapolis regulation dates back to 1853; and the Air Force Academy, following tradition, adopted a similar requirement when it was organized in 1955.

### III.

### THE FIRST AMENDMENT

The First Amendment to the Constitution provides in part that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof."

It is urged by the plaintiffs that the compulsory chapel requirements quoted above have a purpose which advances religion and have a primary effect which in some ways advances and in other ways inhibits religion in violation of the First Amendment.

The defendants on the other hand urge that the requirement to attend is not a requirement to worship; that the purpose of attendance is purely secular and an integral part of the military training accorded to the various groups of cadets, and that its primary effect is to instill in the cadets an understanding of the religious values which can at times motivate the men who will ultimately come under their command.

The conduct of the service Academies is a military activity (perhaps in the long run the most important military activity) of the United States. It is administered by the respective military services and Secretaries and under the overall responsibility of the Secretary of Defense.

Accordingly to put the issues in proper perspective it would seem appropriate, at the very outset, to note the limitations which have traditionally guided the courts in dealing with matters military.

The Courts have always been reluctant to interfere in the management of the military services. Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); Nixon v. Secretary of Navy, 422 F.2d 934 (2nd Cir. 1970); Raderman v. Kaine, 411 F.2d 1102 (2nd Cir. 1969); Byrne v. Resor, 412 F.2d 774 (3rd Cir. 1969); Smith v. Resor, 406 F.2d 141 (2nd Cir. 1969); United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2nd Cir. 1968), cert. denied 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969); Fox v. Brown, 402 F.2d 837 (2nd Cir. 1968); Wasson v. Trowbridge, 382 F.2d 807, 812 (2nd Cir. 1967); Noyd v. McNamara, 378 F.2d 538 (10th Cir.), cert. denied 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967); Luftig v. McNamara, 373 F.2d 664 (D.C.Cir. 1967); Feliciano v. Laird, 311 F.Supp. 791 (E.D.N.Y.1970); Dash v. Commanding General, 307 F.Supp. 849 (D.S.C.1969); Arnheiter v. Ignatius, 292 F.Supp. 911 (N.D.Calif.1968); Rank v. Gleszer, 288 F.Supp. 174 (D.Colo.1968).

The problem here facing the Court is but one facet of the age-old problem of how to balance the requirements of the military and its needs for discipline and training with the Constitutionally protected rights and privileges of the civilian society.

Mr. Justice Harlan succinctly noted in Noyd v. Bond, 395 U.S. 683, 694, 89 S.Ct. 1876, 1883, 23 L.Ed.2d 631 (1969) that

"In reviewing military decisions, we must accommodate the demands of individual rights and the social order in a context which is far removed from those which we encounter in the ordinary run of civilian litigation, whether state or federal."

As a guiding principle it can be said that the amount of judicial interference with the military should be limited; the amount of deference given the military in matters of discipline and train-

ing should be wide. As Mr. Justice Jackson commented:

"[J]udges are not given the task of running the Army. * * * The military constitutes a specialized community governed by a separate discipline from that of the civilian." Orloff v. Willoughby, 345 U.S. 93–94, 73 S.Ct. 540 (1953).[6]

The reason for this special treatment is the unique role which the military performs. Mr. Justice Black pointed out in Toth v. Quarles, 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955), and it was re-emphasized by Mr. Justice Douglas in O'Callahan v. Parker, 395 U.S. 258, 262, 89 S.Ct. 1683, 1685, 23 L.Ed.2d 291 (1969) that

"Unlike courts, it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise."

Judge Latimer of the United States Court of Military Appeals in a similar vein has written "that military units have one major purpose justifying their existence: to prepare themselves for war and to wage it successfully. That purpose must never be overlooked in weighing the conflicting rights of the serviceman * * * and the right of the Government to prepare for and pursue a war to a successful conclusion." U. S. v. Voorhees, 4 U.S.C.M.A. 509, 531, 16 C.M.R. 83 (1954). And in the same opinion, Chief Judge Quinn, while speaking strongly to the constitutional rights of men in uniform, pointed out that "there are differences between the civilian and military communities." *Id.* at 531.

A most forceful statement of the limitation on the judiciary when dealing with matters military comes from former Chief Justice Warren.

"So far as the relationship of the military to its own personnel is concerned, the basic attitude of the Court has been that the latter's jurisdiction is most limited.

\* \* \* \* \* \*

" * * * [I]t is indisputable that the tradition of our country * * * has supported the military establishment's broad power to deal with its own personnel. The most obvious reason is that courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have. *Many of the problems of the military society are, in a sense, alien to the problems with which the judiciary is trained to deal.*" [Emphasis supplied] Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 186–187 (1962).

The Second Circuit, speaking to issues which parallel this case, has echoed the ideas of Chief Justice Warren.

"*Few decisions properly rest so exclusively within the discretion of the appropriate government officials than the selection, training, discipline and dismissal of the future officers of the military* \* \* \*. Instilling and maintaining discipline and morale in these young men who will be required to bear weighty responsibility in the face of adversity—at times extreme— *is a matter of substantial national importance scarcely within the competence of the judiciary.*" (Emphasis supplied.) Wasson v. Trowbridge, 382 F.2d 807, 812 (2nd Cir. 1967).

Of course it is uncontested that a member of the armed services retains certain fundamental rights notwithstanding his membership in the military. The Supreme Court has left no doubt as to the applicability of the Constitution to the Military establishment. Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). And, as the Court of Military Appeals has said, "[T]he protections in the Bill of Rights, except those which are expressly or by necessary implication inapplicable, are available to members of

---

6. Mr. Justice Harlan in a separate context also has emphasized the unique position of military personnel in American society.

Carrington v. Rash, 380 U.S. 89, 100–101, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (dissenting opinion).

our armed forces." U. S. v. Jacoby, 11 U.S.C.M.A. 428, 431–432, 29 C.M.R. 244, 246–247 (1960). However, it is equally clear that being a member of the armed services does curtail the assertion of certain constitutional rights.[7] As Chief Judge Quinn of the United States Court of Military Appeals wrote:

"Service in the armed forces, in both war and peace, entails substantial restriction on fundamental rights." Quinn, The U. S. Court of Military Appeals and Individual Rights in the Military Service, 35 Notre Dame Law, 491 493 (1960).

The Second Circuit has said, as to the rights of a member of the armed services:

"Of necessity, he is forced to surrender many important rights. He arises unwillingly at an unreasonable hour at the sound of a bugle unreasonably loud. From that moment on, his freedom of choice and will ceases to exist. He acts at the command of some person— not a representative of his own choice —who gives commands to him which he does not like to obey. He is assigned to a squad and forced to associate with companions not of his selection and frequently the chores which he may be ordered to perform are of a most menial nature. Yet the armed services, their officers and their manner of discipline do serve an essential function in safeguarding the country. The need for discipline, with the attendant impairment of certain rights, is an important factor in fully discharging that duty." Raderman v.

Kaine, 411 F.2d 1102, 1104 (2nd Cir. 1969).

There is nothing revolutionary in concluding that one logically distinguishable group in society enjoys more limited rights than ordinary individuals. Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Meehan v. Macy, 425 F.2d 469, 470 (D.C.Cir.1968); Ginsberg v. N. Y., 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

Nor is it revolutionary to say that First Amendment rights are not absolute. Callison v. United States, 413 F.2d 133, 136 (9th Cir. 1969). And although the Religion Clauses are couched in absolute terms, it is not realistically possible to have absolute or perfect separation and non-involvement. Zorach v. Clauson, 343 U.S. 306, 312, 72 S.Ct. 679, 96 L.Ed. 954 (1952). The very existence of the clauses denotes an involvement of sorts. As the Chief Justice has said, " * * * [T]here is room for play in the joints productive of a benevolent neutrality * * *." Walz v. Tax Commission, 397 U.S. 664, 669, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970). The Religion Clauses are in effect boundaries laid out to avoid excessive entanglement.

Tradition—and the continuous public acceptance of a practice—carries weight and demands recognition. The practice of compulsory chapel at the military academies did not arise only yesterday. There is an unbroken pattern of 150 years of mandatory chapel under the eyes of the President and the Congress,[8]

7. *Cf.* Kester, Soldiers Who Insult The President, An Uneasy Look at Article 88 of The Uniform Code of Military Justice, 81 Harv.L.Rev. 1697, 1743 (1968).

8. A Board of Visitors is constituted annually to each of the service academies. It is made up of the Chairman of the Committee on Armed Services of the Senate (or his designee); three other members of the Senate (two of whom are members of the Committee on Appropriations); the Chairman of the Committee on Armed Services of the House of Representatives (or his designee); four other members of the House of Representatives (two of whom are members of the Committee on Appropriations); and six persons designated by the President. Among their duties are to inquire into the morale and discipline, the curriculum, instruction, physical equipment, fiscal affairs, academic methods and other matters relating to the Academy. The Board is required to report to the President within sixty days after its annual visit to each academy. Title 10, §§ 4355, 9355, 6968.

the military authorities, and the public in general. Such tradition cannot be lightly discarded; and the longer its existence the greater its influence on the constitutional interpretation of the regulations involved.

As Judge (later Mr. Justice) Cardozo observed "Not lightly vacated is the verdict of quiescent years." Coler v. Corn Exchange Bank, 250 N.Y. 136, 164 N.E. 882, 884 (1928). In the same vein is Mr. Justice Holmes' comment that "a page of history is worth a volume of logic." New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). In a later case, Jackman v. Rosenbaum, 260 U.S. 22, 31, 43 S.Ct. 9, 10, 67 L.Ed. 107 (1922) Mr. Justice Holmes further reiterated the force of tradition in these words:

"[I]f a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it."

■ The Court recognizes of course that long continued use cannot turn a constitutional violation into a right. However, the purpose of a statute or regulation can change over the years from "the impermissible purpose of supporting religion" to the "permissible purpose of furthering overwhelmingly secular ends." School District of Abington Township, Pa., v. Schempp, 374 U.S. 203, 264, 83 S.Ct. 1560, 1593–1594, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); Walz v. Tax Commission, supra, 397 U.S. at 687, fn. 8, 90 S.Ct. 1409 (Brennan, J., concurring).

The Court turns now to a closer examination of the chapel attendance regulations in relation to the Freedom of Religion Clauses of the Constitution.

In School District of Abington Township, Pa. v. Schempp, *supra*, 374 U.S.

at 222, 83 S.Ct. at 1571, Mr. Justice Clark set down the test to be followed in determining whether the Freedom of Religion Clauses of the First Amendment have been violated. " * * * [T]o withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

The Chief Justice re-framed the issue in these words:

"Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are *intended* to establish or interfere with religious beliefs and practices or have the effect of doing so." [Emphasis supplied] Walz v. Tax Commission, *supra*, 397 U.S. at 669, 90 S.Ct. at 1412.

The most cogent testimony as to "purpose" and "effect" of mandatory chapel attendance, as might be expected, was given by those people directly charged with the training of the cadets.

Among others, the defendants called upon Rear Admiral James Calvert, the Superintendent of the Naval Academy, Admiral Thomas Moorer, the then Chief of Naval Operations and now Chairman of the Joint Chiefs of Staff, and Mr. Roger Kelley, the Assistant Secretary of Defense for Manpower and Reserve Affairs. They testified substantially as noted below.

The cadets are required only to *attend* church or chapel services and to remain attentive in keeping with the avowed purpose of the activity; they are not required to participate in the service or to worship. The choice is left to each individual.[9] There is no punishment for non-participation. The activities involved are not aimed at the cultivation of religious faith or motivation,[10] but are

---

9. When the age, maturity, and voluntary position of the individuals are considered, the problems of peer pressure and youthful minds which loomed large in the school prayer cases (Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), School District of Abington

Township, Pa. v. Schempp, *supra*, 374 U.S. 203, 83 S.Ct. 1560) present no obstacle.

10. *Cf.* Kayser, Church and State: Cooperative Separation, 60 Mich.L.Rev. 1, 31 (1961).

aimed rather at the complete training of future officers who in combat will shoulder awesome responsibilities. For this reason the young men who volunteer to become cadets submit themselves to a training program the rigors of which far exceed those of other institutions of higher learning. The Academies are called upon to educate and train as effective combat leaders these young men who represent the country's key reservoir of officer talent and who are expected to set and maintain the standards for performance and conduct of all commissioned officers. Particular emphasis is placed necessarily on inculcating a sense of duty, integrity, and moral responsibility. Experience has shown that these qualities and a sensitivity to the spiritual needs of men in times of combat crisis are essential in leading men in the face of danger. Why some men resort to religion or spiritual values as support and strength in times of extreme danger and trial must be understood by a commanding officer.

Within the overall training program of the academies the most effective method of inculcating this sensitivity is attendance at chapel or church services which provide the only opportunity to observe the impact that spiritual values have on the lives of men. It would be as inconsistent with the responsibility the Academies have to train complete combat officers to ignore this necessity as it would be to ignore the more obvious physical and tactical education.

> "One of the most challenging aspects of officership is the ability to draw out the best in the people who are subordinate to that officer's command, and the ability to draw out the best in those people requires, beyond any question, an understanding of the spiritual value system that those people use as a basis for conducting their lives and this spiritual value system is put to the most rigorous test in military life, particularly in conditions of combat and crisis." [11]

Highly trained military leaders are essential to national security, and the understanding gleaned from chapel attendance is necessary to mold the well-trained officer. Without it a vital component of officer development would be missing causing a weakness in the fiber of the officer corps which in the long run would have a harmful effect on national security. Lectures or courses in moral guidance, comparative religion, or ethics would not achieve the same effect as attendance since the crucial element of observation would have been removed. Secretary Kelley testified:

> "The opportunity to observe others at worship is clear manifestation of the manner and the extent to which they draw upon God or a supernatural being in the conduct of their lives." [12]

Specifically as to the *"purpose"* of mandatory attendance Secretary Kelley further testified:

> "Very simply the reason for the requirement is to help the midshipmen and the cadets understand the basis of religious belief and practice on the part of other midshipmen and cadets and thus equip him for positions of leadership responsibility in later service life."

And Admiral Moorer said:

> "The purpose, of course, is to enhance his leadership and command ability by putting him in a position where he can get a feel, an understanding of the impact of religion on the various types of individuals and so he can see this in operation; and, consequently, as he acts as a leader in later years, he will appreciate this impact that religion will have on so many people.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> "[T]hat is the sole purpose. We are in the process of developing leaders and this is a vital part of the overall leadership package; and that is the sole purpose."

11. Testimony of Secretary Kelley, Tr. Vol. V at 28.

12. Tr. Vol. V at 27.

Looking to the *primary effect* (as contrasted with purpose) the Chief Justice has pointed out that the end result—the effect—must not be *"excessive* government entanglement with religion. The test is inescapably one of degree." (Emphasis supplied) Walz v. Tax Commission, *supra,* 397 U.S. at 674, 90 S.Ct. at 1414.[13]

As Secretary Kelley testified:

"The institutional judgment of the Department of Defense as to the primary effect of required chapel attendance is to develop in those required to attend chapel an understanding of the religious beliefs and the spiritual value systems of other midshipmen and cadets. * * *

"I meant primary effect of requiring attendance at chapel is to instill in a midshipman the understanding of the religious beliefs of others."

And Admiral Moorer added:

"The primary effect is to generate in the individual a better understanding of the impact, related on the lives of men, and certainly permitting them in the future to be better leaders.

&ast; &ast; &ast; &ast; &ast; &ast;

"When we experience a crisis situation, different men react in different ways, and it is very important that the commander, or the senior man on the scene of the conflict or difficulty, understands why the various men in his command will react in a different way, and why some of them find a need to resort to religion to support them in this time of extreme danger and extreme trial. And unless he understands that many people have this feeling and have this need to resort to their religious beliefs to provide strength to them in this period of crisis, he cannot properly, in my view, handle this crisis situation."

As indicated earlier the Court is prepared to and does accord great weight to the opinions and the judgment of those military experts who have the responsibility of training and developing the country's future military leaders. In the absence of any compelling testimony to the contrary, it agrees with their evaluation that the purpose of required attendance at church or chapel service is wholly secular; that it is a vital part of the overall training program designed to create effective officers and leaders by preparing them to meet all the exigencies of command. The Court also agrees that the primary effect of required attendance is secular in that it enables those who will one day hold command positions to gain an awareness and respect for the force religion has on the lives of men so as to react for the benefit of all in combat crises including the giving of spiritual counseling and guidance to those who turn to religion in such situations.

In according deference to the opinions and judgments of the military, the Court is not downgrading the testimony proffered by the plaintiffs. The plaintiffs introduced forceful testimony as to the negative effects of compulsory attendance at worship services upon mankind in general. And it is undeniable that the plaintiffs adduced testimony that the mandatory attendance will have some religious effect on some of the cadets. The plaintiffs failed, however, to demonstrate that the effect is anything but slight, insubstantial, and non-extensive.[14] It is significant, too, that the testimony adduced by the plaintiffs was presented by persons who are not now and never have been directly concerned with the training of our military leaders. As moralists the Court must accord them due deference, but in matters military the Court feels constrained to look to the military experts.

13. The Court of Appeals had one month earlier reached the same result in Allen v. Hickel, 424 F.2d 944, 949 (D.C. Cir. 1970). "The question is not whether there is any religious effect at all, but rather whether that effect, if present, is substantial."

14. As has been noted, *supra,* a cadet or midshipman may be excused from attendance for sincerely held reasons or beliefs.

■ With the foregoing testimony in mind, the Court concludes that the Religion Clauses of the First Amendment have not been breached by the chapel attendance requirement.

The Court first makes the necessary distinction between "attendance" and "worship" and holds that attendance under the circumstances in question does not constitute worship. While this distinction might be said to be slight, it is in this case crucial. As Chief Justice Burger has said, "[I]t is an essential part of adjudication to draw distinctions, including fine ones, in the process of interpreting the Constitution." Walz v. Tax Commission, *supra*, 397 U.S. at 679, 90 S.Ct. at 1416.

The Court next finds that the purpose and primary effect of compulsory attendance cannot be said to either substantially "advance" or "inhibit" religion. The thrust is toward the complete training of a military leader. The effect of attendance is no different than the effect of other regulations which all blend together to mold the future officer. "The educational system at the service Academies is a total educational and training concept having to do with developing the whole man, the whole officer. * * * There is an integration between the elements of the total system and each makes its own significant contribution to developing the whole man-officer which equips him as a leader of men." [15]

Any advancement or inhibition, any sponsorship or hostility (and the Court finds none) would only be incidental. And if only incidental, it would be insufficient to hold it in violation of the Religion Clauses. As Mr. Justice Harlan wrote, concurring in Board of Education of Central School Dist. No. 1 v. Allen, 392 U.S. 236, 249, 88 S.Ct. 1923, 1929, 20 L.Ed.2d 1060 (1968):

"I would hold that where the contested governmental activity is calculated to achieve non-religious purposes otherwise within the competence of the State, and where the activity does not involve the State 'so significantly and directly in the realm of the sectarian as to give rise to * * * divisive influences and inhibitions of freedom,' [School District of Abington Township, Pa. v. Schempp, *supra*, 374 U.S. at 307] id., at 307, 83 S.Ct. at 1616 (concurring opinion of Goldberg, J.), it is not forbidden by the religious clauses of the First Amendment."

■■ This mandatory attendance requirement also meets the test for the Free Exercise Clause as laid down in School District of Abington, Township, Pa. v. Schempp, *supra*, 374 U.S. at 223, 83 S.Ct. 1560. To come into conflict with the Clause it must be shown that there is a coercive effect which operates against the individual in the practice of his religion. These regulations in no way operate against a cadet in practicing his own religion or in practicing none. The individual chooses which service to attend and he chooses whether to participate and worship or not. And for sincerely held reasons he can be excused from attendance.

Nor does compulsory chapel attendance violate the standards set down by Mr. Justice Brennan in his concurring opinion in School District of Abington Township, Pa. v. Schempp, *supra*, 374 U.S. at 203, 83 S.Ct. 1560, and restated in Walz v. Tax Commission, *supra*, 397 U.S. at 680, 90 S.Ct. at 1417, 25 L.Ed.2d 697. Mr. Justice Brennan held that "those involvements of religious with secular institutions" are forbidden "which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice."

The attendance requirements do not "serve the essentially religious activities of religious institutions" as their principal effect is to carry out secular pur-

---

15. Testimony of Secretary Kelley, Tr. Vol. V at 37.

poses—the training of future military leaders. Nor do they "employ the organs of government for essentially religious purposes." To the extent that the chapel attendance requirements further secular ends, they do not advance "essentially religious purposes." To the extent that purely religious activities are benefited by the requirements, the benefit is passive. Nor do they "use essentially religious means to serve governmental ends, where secular means would suffice." To accomplish the end involved—the complete training of future military leaders—it is the judgment of military experts that secular means would not suffice. With this judgment the Court agrees.

As the Chief Justice has pointed out the Religion Clauses "mark boundaries" so as to "avoid excessive entanglement." Walz v. Tax Commission, *supra*, 397 U. S. at 670, 90 S.Ct. 1409. The Court concludes that the involvement of these regulations with religion falls outside the boundaries. The Court accordingly affirmatively finds that church or chapel attendance is an integral and necessary part of the military training of the future officer corps, that its purpose is purely secular, and that its primary effect is purely secular.

## IV.

## ARTICLE VI

It is also claimed by the plaintiffs that mandatory church or chapel attendance imposes a "religious test" for officers in violation of Article VI of the Constitution. Article VI reads in pertinent part:

> "No religious test shall ever be required as a qualification to any office or public trust under the United States."

As there is no case law directly in point [16] the Court for guidance looks back to the historical context in which the Article was adopted.

When the Revolutionary War began, England and every American colony with the exception of Rhode Island had an "established church" or "established religion." [17] However, by the time of the Constitutional Convention eleven years later strong support had developed for the proposition that no person should be denied political rights because he did not share the religious beliefs of the majority. [18]

The Founding Fathers were in accord with this view and were determined that the Federal Government should have no grant of delegated power to deal with religion. Lack of delegation it was felt

16. The Supreme Court did briefly discuss Article VI and the religious test oath in Torcaso v. Watkins, 367 U.S. 488, 490–491, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) but decided the case on First Amendment grounds since the plaintiff held state rather than federal office.

17. "There were established churches in at least eight of the thirteen former colonies and established religions in at least four of the other five." Engel v. Vitale, 370 U.S. 428, 82 S.Ct. 1265. See generally S. Cobb, The Rise of Religious Liberty in America (1902) and C. Antieau, A. Downey and E. Roberts, Freedom from Federal Establishment (1964).

By "Establishment" was meant any alliance between church and state which could have one or more of the following characteristics:

"1. A state church officially recognized and protected by the sovereign;

2. *A state church whose members*

alone were eligible to vote, to hold public office, and to practice a profession;

3. A state church which compelled religious orthodoxy under penalty of fine and imprisonment;

4. A state church willing to expel dissenters from the commonwealth;

5. A state church financed by taxes upon all members of the community;

6. A state church which alone could freely hold public worship and evangelize;

7. A state church which alone could perform valid marriages, burials, etc." [Emphasis supplied] C. Antieau, A. Downey, E. Roberts, Freedom from Federal Establishment, *supra*, at 1.

18. But in only two of the thirteen states, Rhode Island and Virginia, was full and perfect freedom of religion conceded by law. S. Cobb, The Rise of Religious Liberty in America, *supra*, at 482–509.

would remove "the fundamental power of religious establishment: the ability to control the political process through interference in the claims of conscience." [19]

However, when the Convention reached the question of granting Congress the power to establish qualifications for federal office the problem of a religious test oath arose. Such oaths had been prevalent in every colony but Rhode Island; and while there were variations in the groups restricted, most made belief in some Protestant sect a requirement.[20] New Jersey as the first colony to adopt a constitution set the example.

> "[A]ll persons professing a belief in the faith of any Protestant sect * * * shall be capable of being elected into any office of profit or trust, or being a member of either branch of the Legislature, and shall fully and freely enjoy every privilege and immunity, enjoyed by others their fellow subjects." F. Thorpe, American Charters, Constitutions and Organic Laws, Vol. V, at 2597 (1909).

The effect of these religious test oaths was to prevent those who did not profess belief in the established church or religion of the state from exercising the basic political and economic rights of voting, holding office, practicing a profession, or becoming an officer in the militia.[21]

It was against this background that the religious test oath was accepted by the Convention. It was based upon the Founding Fathers' fear that the power to determine the qualifications for office might carry with it by derivation or implication the power to use religion as a basis for qualification.[22] And this they wanted to prevent.

 It is clear from the history behind the adoption of the clause and from the subsequent debates in the state ratifying conventions that the banning of the religious test oath in the Constitution was to keep the Federal Government from creating an established religion.[23]

 Thus, from an historical standpoint there is a close connection between the establishment prohibition and the test oath prohibition. The Court having determined that there is no violation of the Establishment Clause in the mandatory attendance regulations, it necessarily follows that there can be no violation of the test oath prohibition.

Further and as a practical matter if one considers that the Academy graduates constitute less than five percent of the officer corps, it can hardly be said that the Academy regulations interpose a test which prevents others from becoming officers in the armed services of the United States. The Court accordingly finds these regulations not to be a religious test and not a violation of Article VI.

This opinion constitutes the Court's findings of fact and conclusions of law.

## V.

## ORDER

In the light of the foregoing it is hereby

Ordered:

(1) Plaintiffs' motion for a declaratory judgment that compulsory chapel attendance violates the Constitution is denied.

(2) Plaintiffs' motion for a permanent injunction forbidding the Academies from enforcing the requirement, is denied.

(3) Plaintiffs' motion for a permanent injunction forbidding the Academies from disciplining the cadets and midshipmen for their involvement in this suit, is granted.

19. C. Antieau, A. Downey and E. Roberts, Freedom from Federal Establishment, *supra*, at 110.

20. *Id.* at 92–110.

21. *Id.* at 10–16.

22. *Id.* at 99.

23. Elliot's Debates, II, 149, 202; Elliot's Debates, III, 204, S. Cobb, The Rise of Religious Liberty in America, *supra*, at 508.