Mark **AVRECH**, Appellant,

v.

The **SECRETARY OF the NAVY.**
No. 71–1841.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 1972.

Decided March 20, 1973.

---

23. H. Longfellow, *Elegiac Verse,* stanza 14 (1881).

Dorian Bowman, New York City, and David Rein, Washington, D. C., for appellant.

Harold H. Titus, Jr., U. S. Atty., and John·A. Terry, Michael A. Katz and James F. McMullin, Asst. U. S. Attys., for appellee.

Before Mr. Justice CLARK,* and WRIGHT and WILKEY, Circuit Judges.

Mr. Justice CLARK:

Appellant, Mark Avrech, brought this suit seeking a declaration that his 1969 court-martial conviction was constitutionally invalid under the First and Fifth Amendments and an order that the conviction be expunged from his military record and that he recover all pay and benefits lost by reason of the conviction.[1] Avrech was convicted of violating Article 134 of of the Uniform Code of Military Justice, known as the

---

\* Mr. Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a) (1970).

1. The jurisdiction of the District Court is not questioned here nor is the existence of a case or controversy. We find both jurisdiction and justiciability present.

"General Article,"[2] which imposes criminal sanctions on "all disorders and neglects to the prejudice of good order and discipline in the armed forces" and "all conduct of a nature to bring discredit upon the armed forces."[3] More specifically, Avrech was charged with attempting to publish and publishing a statement disloyal to the United States, with design to promote disloyalty and disaffection among the troops. After pleading not guilty, he was acquitted of publishing but found guilty of attempting to publish the statement. He complains that the language of Article 134 is unconstitutionally vague and overbroad under the Fifth Amendment in that the Article did not give him fair notice that his contemplated statement was forbidden; he also urges that his statement was protected free speech under the First Amendment. The District Court upheld his conviction. We reverse on the Fifth Amendment ground.

1. *Background of the Prosecution:*

Avrech enlisted in the Marines in 1967 and was sent to Vietnam in February, 1969, with the rank of private first class. While stationed at Danang and on night duty with the group supply offices, Avrech typed up a stencil criticizing American involvement in Vietnam. It stated:

> "I've been in this country now for 40 days and I still don't know why I'm here. I've heard all the arguments about communist aggression and helping the poor defenseless people. I've also heard this three years ago. The entire Vietnamese Army will switch to a pacification role in 1967 and leave major fighting to the American troops. (Statement of South Vietnamese Foreign Minister, L. A. Times, Nov. 18, 1966.) It seems to me that the South Vietnamese people could do a little for the defense of their country. Why should we go out and fight their battles while they sit home and complain about communist aggression. What are we cannon fodder or human beings? If South Vietnam was willing to go it on their own back in 1964 what the hell is the matter with them now? The United States has no business over here. This is a conflict between two different politically minded groups. Not a direct attack on the United States. It's not worth killing American boys to have Vietnam have free elections. (Former Vice President Richard M. Nixon, L. A. Times, December 31, 1967.) That was our present leader of this country and now he has the chance to do something about the situation and what happens. We have peace talks with North Vietnam and the V.C. That's just fine and dandy except how many men died in Vietnam the week they argued over the shape of the table? Why does this country think that it can play games with peoples lives and use them to fight their foolish wars, I say foolish because

2. Article 134, General Article, 10 U.S.C. § 934:
"Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court."
The third clause, referring to crimes and offenses not capital, is not in issue in this case. References in the opinion to Article 134 or the General Article are meant to encompass only the first two clauses.

3. Maximum punishments under the Uniform Code are fixed in the Manual for Courts-Martial by Executive Order of the President. Article 134 punishments run from 20 years imprisonment and dishonorable discharge for assault with intent to commit murder or rape to one month's imprisonment and forfeiture of two-thirds of one month's pay for, e. g., appearing in an unclean uniform. The offense charged here carries a three year maximum sentence. See Table of Maximum Punishments, *Manual for Courts-Martial*, 1969.

how can you possibly win anything like a war by destroying human lives. Human lives that have no relation at all to the cause of the conflict. Do we dare express our feelings and opinions with the threat of court-martial perpetually hanging over our heads? Are your opinions worth risking a court-martial? We must strive for peace and if not peace then a complete U.S. withdrawal. We've been sitting ducks for too long. ***** *SAM* "

Sometime thereafter Avrech asked his immediate superior, Corporal William R. Jackson, who was operating the mimeograph machine in their office, to duplicate the statement or permit him to do so. When Jackson inquired as to the content of the stencil, Avrech replied: "If I tell you that you won't let me run it off." Jackson then refused. Later Avrech let Jackson read the stencil; the latter reproached Avrech and subsequently turned it over to a superior officer. This prosecution folllowed.

Avrech was sentenced to confinement at hard labor for one month, reduction in rank, and forfeiture of pay for three months. The Commanding Officer suspended the confinement but the remainder of the sentence was sustained by the Staff Judge Advocate and the Judge Advocate General of the Navy. On June 26, 1970, Avrech received a bad conduct discharge after a second and unrelated special court-martial conviction for having stolen a camera from the Navy Exchange. The Navy Court of Military Review, in ordering the discharge, took into account Avrech's conviction here under attack.

The District Court granted the Government's motion for summary judgment, holding that Avrech's statement was not protected by the First Amendment and that Article 134 provides a sufficiently definite warning as to the proscribed conduct and a sufficiently ascertainable standard of guilt to survive the constitutional vagueness challenge.

## 2. History and Components of Article 134:

We need not pause to detail the history of Article 134. Its antecedents go back to British military sources prior to American Independence. In this country the Constitution entrusted to the Congress the power "to make Rules for the Government and Regulation of the land and naval Forces," Article I, § 8, Cl. 14. In 1950, pursuant to this grant, the Congress adopted the Uniform Code of Military Justice. Article 134 of the Code includes three clauses which prohibit (1) "all disorders and neglects to the prejudice of good order and discipline in the armed forces;" (2) "all conduct of a nature to bring discredit upon the armed forces;" and, (3) crimes and offenses not capital (this last clause not being here in issue). The General Article is the American version of an older provision of military law known by the British as the "Devil's Article." A distinguished commentator and leading authority in the field, William Hough, made no attempt to define the "disorders" proscribed in the Article's antecedents, only characterizing them as acts that "more usually take place under circumstances unconnected with duty and are esteemed disorderly or insubordinate conduct." The Practice of Courts-Martial (1825) at 634. Hough's examples of "disorders" included habitual insubordinate language and conduct at the mess, drunkenness, abusing and striking a sentry on duty, and adultery with the wife of a soldier. Id. at 642. Hough defined "neglect" to mean "neglecting to observe standing orders and regns., or, those orders which are issued and intended to be carried into immediate execution or shortly after." Id. at 633. His examples of "neglect" included keeping the books in a negligent manner, not reporting infectious diseases to the proper authority, and allowing government goods to be stolen. Id. at 641. The second clause of Article 134, prohibiting "all conduct of a nature to bring discredit

upon the armed forces," was originally enacted for the "single purpose" of subjecting retired enlisted men to court-martial punishment for conduct similar to that proscribed under Article 133 for retired officers. Both clauses have been expanded beyond recognition and now encompass the residue of offenses that have sprung up with what were thought to be the necessities of disciplining the ever-increasing population of the armed forces. While the United States Court of Military Appeals has held that conduct condemned by the General Article must be "directly and palpably—as distinguished from indirectly and remotely—prejudicial to good order and discipline," United States v. Holiday, 4 USCMA 454, 456 (1954), the Article now encompasses over seventy specific offenses. The listed offenses range from "abusing a public animal" to "disloyalty to the United States" with such offenses as dishonorably failing to pay a debt, straggling, pandering, and assault with intent to commit murder in between. This crazy quilt of offenses is patched together in the Manual for Court-Martial, issued as an Executive Order of the President under Article 36 of the Code, which authorizes the President to prescribe "procedure, including modes of proof, in cases before courts-martial." The latest manual, promulgated by an Executive Order of the President, is dated June 19, 1969 and known as Manual for Courts-Martial, United States, 1969 (Revised edition). The military forces have "amplified" (to use a word employed in the Government's brief) the General Article by including in Appendix 6—Forms for Charges and Specifications—the seventy-odd charges described above. The Executive Order "prescribing" the Manual has saving clauses covering prior investigations, trial after arraignment or other actions begun before its effective date. A further proviso excludes "any act done or omitted prior to the effective date of this manual which was not punishable when done or omitted."

### 3. *The Theory of the Armed Forces:*

(1) The Government argues that the Article 134 language here under scrutiny has acquired a core of settled and understandable content through long tradition and the listing of specific offenses in the Manual. United States v. Frantz, 2 USCMA 161 (1953). In the *Frantz* case the Court of Military Appeals assumed that civilian vagueness standards apply to the military but concluded that the Article had achieved a meaning sufficiently settled and definite to overcome the vagueness claim. The Government also points to Dynes v. Hoover, 20 How. 65, 15 L.Ed. 838, 61 U.S. 65 (1858), holding that a military law provision comparable in scope to the General Article was not subject to abuse because the nature of the proscribed conduct and its punishment were "well known by the practical men in the navy and army." At 82. And, Winthrop, Military Law and Precedents (2d Edition 1920), in speaking of military custom, includes those service-wide practices which have prevailed for a long period of time and which are "well defined, equitable and uniform in application." At 42–43.

We believe, however, that today Article 134 gives no fair warning of the conduct it proscribes and fails to provide any ascertainable standard of guilt to circumscribe the discretion of the enforcing authorities. Interpretation of the General Article through the Manual to proscribe some seventy explicit offenses, rather than evidencing settled and understandable meaning, indicates just the contrary. For example, not until 1951 did the disloyalty charge prosecuted here become a badge of infamy within reach of the Manual. And even *Frantz*, supra, did not crystallize the phantom offenses that could be included within Article 134, for we find the 1969 edition of the Manual continues to expand their number. Indeed, the only apparent purpose of Article 134 is to act as a catch-all for varied types of unforeseen misconduct not otherwise

covered by the Code. Though servicemen may be instructed on the meaning and proper applications of Article 134, the Article's development demonstrates that its coverage has no limits. At most, instruction could only inform servicemen of the specific conduct deemed punishable under the Article in the past and of the fact that comparable misconduct may likewise be punished. And often this would not shed much light on the peculiar facts involved in the act under scrutiny since even conduct listed in the Manual must be found prejudicial to good order and discipline or service discrediting. United States v. Gittens, 8 USCMA 673 (1953). Nor can we approve the practice under Article 134 of judicially creating new offenses by analogizing them to previously recognized offenses under that Article. See Everett, Article 134, Uniform Code of Military Justice—A Study in Vagueness, 37 North Carolina L. Rev. 142, 152–153, 157–158 (1959). For example, the acceptance of money for transporting passengers in a government vehicle, conduct not mentioned in the Manual under Article 134, has been 'analogized to graft and bribery (three year offenses). United States v. Alexander, 3 USCMA 346 (1953). The Supreme Court recently condemned the "punishment by analogy" approach in Papachristou v. City of Jacksonville, 405 U.S. 156, 168–169, 92 S.Ct. 839, 846, 31 L.Ed.2d 110 (1972): "Such crimes [derived by analogy], though long common in Russia, are not compatible with our constitutional system."

Moreover, the old authorities cited bear little weight. Not only has the General Article been expanded beyond recognition, but the greater percentage of our armed forces are today non-career personnel. They are draftees or enlisted personnel with little military experience. Even the "old soldiers" themselves say that the language in Article 134 judged by the void-for-vagueness cases is "unduly indefinite." Wiener, Are the General Military Articles Unconstitutionally Vague? 54 ABA Journal 357, 363 (1968). Furthermore, the highest of judicial authority in the Army recommends the abolition of Article 134 because "we can't defend our use of it in this modern world. It probably could not withstand a 'vague and indefinite' attack in the Supreme Court." Kenneth J. Hodson (Chief Judge, United States Army Court of Military Review), "Perspective, The Manual for Courts-Martial, 1984," 57 Military Law Review 1, 12 (1972). These two officers, the former a distinguished constitutional authority as well as a World War II colonel in the Judge Advocate General's Department, and the latter, himself a renowned former Judge Advocate General as well as the present Chief Judge of the Army's highest court, speak both impressively and authoritatively. And the opinions of the Military Court of Appeals add more weight to this conclusion. It has held repeatedly that the Manual does not limit or confine Article 134. The Manual is not exhaustive of Article 134 misconduct; its crazy quilt of offenses does not cover Article 134's bed. See, e.g., United States v. Sadinsky, 14 USCMA 563 (1964). Further, the inclusion of specific conduct in the Manual specifications does not necessarily mean the conduct is punishable under the Article. United States v. Alexander, 12 USCMA 26 (1960). The Court of Military Appeals has held that it is reversible error for the court-martial law officer not to instruct that acts charged under Article 134 must be found either to have prejudiced good order and discipline or have discredited the armed forces, even though the charges against the accused track the language of a Manual specification. United States v. Gittens, supra. In United States v. Smith, 13 USMCA 105, 119 (1962), the Court held that Congress never delegated the power to make substantive rules by way of the Manual and that the Manual was intended merely to serve as a substitute for legal research facilities insofar as it includes rules of substantive law. In the same year the court

refused to permit the use of an erroneous instruction on self-defense, though prescribed by the Manual; since it was a matter of substantive law rather than procedure, the Manual did not control. United States v. Acosta-Vargas, 13 USMCA 388. These cases demonstrate it is neither necessary nor sufficient that a serviceman's conduct fit a Manual specification in order for him to incur criminal liability under Article 134. Nothing could point more accusingly to the vagueness of Article 134 than for the Court of Military Appeals to say that in the final analysis, the Manual is but a mini-digest of the roving character of Article 134, whose vague and indefinite language is absolutely controlling. Clearly the broad net of Article 134 will catch an accused though the Manual does not.

(2) Nevertheless, the Government says the clear knowledge of Avrech that his actions might lead to a court-martial shows that he had fair warning that Article 134 prohibited his proposed action. We find the law to the contrary. The fear, if any, which Avrech had that his action might lead to his court-martial does not demonstrate that he knew his actions were covered by Article 134. Nor does it provide a substitute for the Article's vague and indefinite language. Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). There the Court found "it irrelevant that petitioners at one point testified that they had intended to be arrested," since "the record is silent as to what petitioners intended to be arrested for * * *." Whether a statute affords "fair warning . . . must be made on the basis of the statute itself and the other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants." At 355–356, n. 5, 84 S.Ct. at 1703–1704.

(3) The Government says further that civilian standards of specificity do not apply to the military. We have concluded that they do. Indeed, the Court of Military Appeals assumed in *Frantz*, supra, that civilian standards applied and found "the conceivable presence of uncertainty" in the first two clauses of Article 134. However, it found that the Article had acquired the "core of a settled and understandable content of meaning" that established standards "well enough known to enable those within . . . [its] reach to correctly apply them." 2 USMCA at 163. As we have noted, we disagree with this conclusion. Other military courts have also recognized the applicability of civilian vagueness standards. In United States v. Howe, 17 USMCA 165, 178–179 (1967), the Court accepted the application of general Supreme Court standards in civilian cases without indicating any departure from those standards in the name of military necessity. Likewise, we follow the view of the United States Air Force Board of Review in United States v. McLeod, 18 CMR 814 (1954) and the Coast Guard Board of Review in United States v. Barker, 26 CMR 838 (1958). Both applied the requirements of the Fifth Amendment to military courts-martial.

It is true that the Supreme Court originally adopted a hands-off policy towards courts-martial. As late as 1950 the Court quoted with approval re Grimley (United States v. Grimley), 137 U.S. 147, 150, 11 S.Ct. 54, 34 L.Ed. 636 (1890), that "the civil courts exercise no supervisory or correcting power over the proceedings of a court-martial . . . The single inquiry, the test, is jurisdiction." Hiatt v. Brown, 339 U.S. 103 at 111, 70 S.Ct. 495 at 498, 94 L.Ed. 691 (1950). However, in the same year, in a unanimous opinion by Mr. Justice Douglas, the Court stated that if a court-martial denies a defendant the opportunity to raise a defense then it has no jurisdiction to find guilt. Whelchel v. McDonald, 340 U.S. 122, 124, 71 S.Ct. 146, 95 L.Ed. 141 (1950). Three years later in Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), Chief Justice Vinson in an opinion joined by three other members of the Court, stat-

ed that federal courts are empowered to hear a denial of due process by the military, if the latter has refused to hear such claims or has misapplied constitutional requirements. Justices Black and Douglas dissented because they thought the military had misapplied civilian due process standards. Finally, Mr. Justice Black in Reid v. Covert, 354 U.S. 1, 37, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), said the applicability of the Bill of Rights to the military was "as yet . . . not . . . clearly settled." And in O'Callahan v. Parker, 395 U.S. 258, 265–266, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) the Court through Mr. Justice Douglas posed the query whether Article 134 satisfies the standards of vagueness developed by civilian courts, but he did not pause to answer.

The question, however, seems settled in this Circuit by Kauffman v. Secretary of the Air Force, 135 U.S.App.D.C. 1, 415 F.2d 991, 997 (1969), where the court said:

> "We hold that the test of fairness requires that military rulings on constitutional issues conform to Supreme Court standards, unless it is shown that conditions peculiar to military life require a different rule."

It is true that this proviso excepts from Supreme Court standards those situations where conditions peculiar to military life require a different rule. However, the trial court apparently found no such conditions present in this case since it applied Supreme Court standards. None have been shown here. Moreover, as General Hodson points out, other Articles are available to cover the offenses now punished under the General Article, e.g., Articles 92 and 128, which would serve the military just as well.[4] 57 Military Law Rev., 1, 12. The Government, however, questions the application of Supreme Court standards to military personnel stationed in a combat zone. We readily understand its apprehension, but the argument is beside the point because there are Articles other than Article 134 that fully and satisfactorily govern combat situations. Two Articles, 92 and 99, come to mind. They punish failure to obey any lawful order or regulation and misbehavior before the enemy, respectively. As General Hodson so clearly says: "We don't really need" Article 134. It is purely and simply a *housekeeping device and the specific conduct which it has been held to prohibit can be as effectively controlled through the utilization of other Articles of the Code. It therefore appears to us that there is no valid military justification for suspending the application of the constitutional right of fair warning to Article 134.* It follows that the General Article must fall.

Reversed.

---

4. The availability of effective, and we might add, preferable alternatives to punishing disloyal statements under Article 134 is evidenced by the companion cases of United States v. Daniels, 19 USCMA 529 (1970), and United States v. Harvey, 19 USCMA 539 (1970). *Harvey* indicates that disloyal statements are subject to punishment under 18 U.S.C. 2387 as well as Article 134. *Daniels* holds that conviction under Sec. 2387 requires " 'a clear and present danger that the activities in question will bring about the substantive evils' delineated in the statute [insubordination, mutiny, refusal of duty, etc.]" In contrast, Article 134 merely requires a finding that the statement was prejudicial to good order and discipline or service discrediting. In view of the *Harvey* court's recognition of the vagueness problems involved—i. e., "Words by themselves may not always reveal their character . . . The Vietnam war has evolved a vast outpouring of written and oral comment. The language of many of the comments is poised on a thin line between rhetoric and disloyalty to the United States." (at 544)—we doubt the military would consider itself prejudiced if forced to rely on Sec. 2387, incorporating as it does a "clear and present danger" test.