James Edward **CARLSON** et al.,
Plaintiffs,

v.

James R. **SCHLESINGER** et al.,
Defendants.

Civ. A. No. 145–72.

United States District Court,
District of Columbia.

Aug. 23, 1973.

Melvin L. Wulf, Joel M. Gora, American Civil Liberties Union Foundation, New York City, David Addlestone, Lawyers Military Defense Committee, Hope Eastman, Washington National Office, American Civil Liberties Union, Washington, D. C., for plaintiffs.

Harold H. Titus, Jr., U. S. Atty., Michael A. Katz, Asst. U. S. Atty., Washington, D. C., for defendants.

MEMORANDUM OPINION

PARKER, District Judge.

 This suit, brought by James Edward Carlson, Richard Randig and William C. Daniels, Jr., members of the Armed Forces of the United States, who at the time of filing were stationed in South Vietnam, challenges the constitutionality of Air Force Regulation 30–

1(9) [1] which both grants and regulates the right of Air Force Personnel to petition the President, members of Congress and other public officials. Named as defendants are the Secretary of Defense, Secretary of the Air Force and the then Commanders of the Tan Son Nhut Air Base and Cam Ranh Bay Air Base in Vietnam.[2] A declaration is sought that the Air Force Regulation is in violation of the First Amendment of the Constitution and 10 U.S.C. § 1034.[3] Plaintiffs further request the Court to declare their arrests, stemming from incidents relating to the enforcement of this Regulation, as illegal and that their military records be expunged of any reference thereto.[4]

Cross motions for summary judgment have been filed. The Court, having reviewed the record including the memoranda of points and authorities, the various affidavits and the oral argument of counsel, denies defendants' motion and grants summary judgment for the plaintiffs.

### The Factual Background

A review of the pertinent facts is desirable.

### PLAINTIFF JAMES EDWARD CARLSON

Plaintiff Carlson, a Navy enlisted man stationed in Saigon, went to Tan Son Nhut Air Base, and while off duty and in uniform, collected signatures on a petition to Congress calling for a cessation of American involvement in the South East Asian hostilities. This activity took place in front of the Base's main post exchange. His efforts did not result in any disturbance or incident disruptive of normal activities. Thereafter, he was arrested by Air Force Security Police for passing out "anti-war material" and jailed for several hours. He was informed that a charge, solicitation of signatures on an unauthorized anti-war petition, would be brought against him. He was later informed by Naval authorities that no charges would be brought against him and none, in fact, were instituted. Still determined to collect signatures, Carlson twice sought permission through military channels to do so. The first request, made orally to the Base Commander's assistant was rejected with the statement that he would be jailed if he persisted in his efforts. A second written request made to the Commander by a civilian lawyer, acting on Carlson's behalf, was likewise denied.

Carlson has stated by affidavit that during his Vietnam tour of duty he was permitted to gather signatures during his off-duty hours while on Naval property.

Carlson was subsequently honorably discharged from active military duty. Reference to the above-mentioned arrest has been maintained in a Naval Investigation Service Report, the contents of

---

1. The texts of the pertinent Regulations appear at pages 629–630 *infra*.

2. Messrs. Schlesinger and McLucas, Secretaries of Defense and of the Air Force respectively, were automatically substituted as defendants pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

3. Section 1034 of Title 10 of the United States Code provides that:
 "No person may restrict any member of an armed force in communicating with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States."

 The Government contends that this provision can be of little comfort to the plaintiffs in that the regulations here involved and the denied solicitation requests were "necessary to the security of the United States" and that public solicitation of signatures on a petition to Congress is distinguishable from a personal and individual serviceman communication, the latter falling within the statute's scope, while the former being beyond its protection. Although this section has not been judicially interpreted, it appears that the defendants' position vis a vis petitions versus individual communications is somewhat tenuous. It does not seem reasonable to assume that a group petition should be treated less favorably than an individual writing to Congress.

4. Only plaintiffs Carlson and Randig were subjected to arrest.

which are subject to limited disclosure to certain governmental agencies.[5]

## PLAINTIFF RICHARD RANDIG

Randig, an enlisted airman, stationed at Cam Ranh Bay Air Base, while off duty, in civilian attire, and along with another serviceman, attempted to collect signatures on a similar petition at that Base. Later the two men were arrested by military police and charged with the same offense for which Carlson was detained. The petitions were confiscated. After several hours of incarceration he was informed that no further action would be taken and he was released.

Several days thereafter Randig formally requested of the Commander permission to solicit signatures on the congressional petition under restricted and controlled conditions. The request was denied in a summary fashion. Randig received an honorable discharge and there is no evidence that any record of or reference to the arrest incident is maintained by the military.

## PLAINTIFF WILLIAM C. DANIELS, JR.

Daniels served in Vietnam as an Air Force enlistee and was stationed at the Cam Ranh Air Base. After learning about the "anti-war" petition, he joined in Randig's unsuccessful attempt to gain the permission of Air Force authority to collect signatures. This litigant was released from active duty with an honorable discharge. Daniels is presently a college student, as are both Carlson and Randig.

### The Petition and Pertinent Regulations

The petition which the plaintiffs attempted to circulate reads as follows: "We, the undersigned American Servicemen on duty in Vietnam, wish to express our opposition to further United States military involvement by air, sea, or land forces in Vietnam, Laos, Cambodia or other countries in South East Asia. We petition the United States Congress to take whatever action necessary to assure an immediate cessation of all hostilities in South East Asia; to set a near date for final and complete military withdrawal; to insure a rapid and peaceful return of American Prisoners of War; and to assume and assert its responsibility for determination of future American Foreign policy."

Two regulations are particularly relevant, Air Force Regulations 30–1(9) and 35–15. The former in part provides:

### SECTION D–DISSENT AND PROTEST ACTIVITIES

\* \* \* \* \* \*

(9) Right of Petition. Members of the Air Force, their dependents and civilian employees have the right, in common with all other citizens, to petition the President, the Congress or other public officials. However, the public solicitation or collection of signatures on a petition by any person within an Air Force facility or by a member when in uniform or when in a foreign country is prohibited unless first authorized by the commander.
*Reference: AFR 35–15*

The applicable provisions of Air Force Regulation 35–15 are:

### DISSIDENT AND PROTEST ACTIVITIES

\* \* \* \* \* \*

3 Specific Guidelines and Prohibited Activities:

(a) Possession and Distribution of Written or Printed Materials:

\* \* \* \* \* \*

(2) When prior approval for distribution or posting is required, the

5. The Amended Responses To Interrogatories To The Defendant Secretary of Defense, filed April 5, 1973 states:
"20. A reference to the activities . . . exists in a record of the Naval Investigative Service pertaining to a Petty Officer Mohler. No communication or report has been made to any civilian law enforcement officials. The information contained in said file would not be released to anyone except agencies of the Federal government or authorized state or local law enforcement agencies for law enforcement purposes."

commander will determine if a clear danger to the loyalty, discipline, or morale of members of the Armed Forces, or material interference with the accomplishment of a military mission, would result. If such a determination is made, distribution or posting will be prohibited . . . .

The plaintiffs' arrest resulted from their failure to obtain Regulation 30–1(9) authorization and the subsequent denials of the request to petition were based upon the standards of Regulation 35–15, 3(a)(2).[6]

█ Subsequent to the filing of this action the plaintiffs were transferred from Vietnam and later discharged from active duty, prompting the government to move for a dismissal of the complaint on the grounds of mootness.[7] The Court denied that motion since the constitutional violations complained of are capable of being repeated as long as the challenged regulations remained in force. This situation appears to fit neatly into the category of cases which present questions "capable of repetition yet evading review." Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L. Ed.2d 1 (1969). See also Dash v. Commanding General, Fort Jackson, South Carolina, 307 F.Supp. 849 (D.S.C.1969) aff'd 429 F.2d 427 (4th Cir. 1970) where several enlisted men challenged a regulation restricting the right to distribute anti-war leaflets on a military installation. Before reaching the merits, the District Court disposed of the government's contention of mootness based upon the fact that all of the plaintiffs had either been transferred or released from duty, and stated at page 851:

"The issues posed are continuing ones, involving restraints not alone on the plaintiffs but on all noncommissioned personnel, *present or future*, at the base. If, by either the release or transfer of the plaintiffs, the power of the Court to resolve such issues could be destroyed, the rights asserted by the plaintiffs might never be determined since the defendants, who control such releases or transfers, could effectively prevent a review of their actions. Under such circumstances where the problem is 'capable of repetition, yet evading review', the mere transfer or release of all or a part of the plaintiffs will not render the proceedings moot." (Emphasis added)

This Court is in full agreement with that rationale, and finds it applicable and appropriate to the present action.

*Jurisdiction*

The government has raised two further jurisdictional challenges: first, that the requirements of 28 U.S.C. § 1331(a), namely that the amount in controversy be in excess of $10,000, have not been satisfied and secondly, that mandamus relief, pursuant to 28 U.S.C. § 1361, is inappropriate and cannot therefore serve as a basis for subject matter jurisdiction. The Court finds, however, that § 1331(a) jurisdiction is not lacking and therefore rejects the defendant's contentions.

In Gomez v. Wilson, 477 F.2d 411 (D. C.Cir. 1973) the Court of Appeals for this Circuit addressed the gnawing problem federal courts have been confronted with when called upon to pass upon § 1331(a) jurisdiction in suits involving abridgements of individual liberties. Acknowledging that Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1971)[8] rejects the

6. See pages 633–636 *infra,* and footnotes contained therein.

7. The defendants also contended in that motion that there existed no reference to the incidents in question, thereby obviating plaintiffs' need to seek expungement. At the time the record was unclear as to the exact status of the military record keeping with respect to these plaintiffs. As previously noted, the record now reflects that the military has maintained notations of Carlson's activities, but has not done so as to Daniels and Randig.

8. "[I]n suits against federal officers for alleged deprivations of constitutional rights, it is necessary to satisfy the amount-in-controversy requirement of federal jurisdiction." Lynch v. Household Finance Corp., 405 U.S. at 547, 92 S.Ct. at 1119.

proposition that in such cases the monetary requirement may be abandoned, the *Gomez* Court noted that:

"[w]ith remarkable expansion of remedies in damages to enable redress of invasions of an incalculable variety of personal interests, monetary valuation of fundamental civil rights seems hardly impossible today" (citations omitted) 477 F.2d 421 n. 56. The Court further observed that ". . . notwithstanding a deep-seated feeling that price-tagging of fundamental human rights is dangerous business, we realize that any automatic finding of the required amount in controversy just because such rights are in issue may be a more simplistic solution than § 1331(a) will tolerate. Moreover, we find it hard to believe that demonstration of jurisdictional amount is a difficult task where the right asserted is truly basic." *Id.*

■■ In this suit, plaintiffs Carlson and Randig were arrested and detained for several hours as a result of activities which, as will be more fully developed below, were deserving of constitutional shelter. Military records noted the incident as to Carlson. Although plaintiffs have not to date indicated that they have suffered directly as a result of the episodes involved, the very fact of arrest may, at some later time, cause both litigants considerable detriment, most notably in various employment or professional endeavors. To be sure, the fact of arrest can be a plaguing "blight in one's background." Bilick v. Dudley, 356 F. Supp. 945, 951 (S.D.N.Y.1973).[9] Plaintiffs assertions as to the amount-in-controversy are not impaired merely because the value to be accorded basic liberties, and possible detriment flowing therefrom, cannot be neatly or precisely determined. Gomez v. Wilson, *supra* 477 F.2d at 420 n. 51.

■■ The Court concludes that the plaintiffs, based upon the arrests and their potential ramifications have sufficiently established § 1331(a) jurisdiction.[10]

### Applicable Standards

In a recent opinion, Stolte v. Laird, 353 F.Supp. 1392 (D.D.C.1972), Judge Robinson of this Court stated that: "military rulings on constitutional issues (must) conform to Supreme Court standards, unless it is shown that conditions peculiar to military life require a different rule," citing Kauffman v. Secretary of the Air Force, 135 U.S.App.D. C. 1, 415 F.2d 991 (D.C.Cir. 1969), cert. denied, 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505 (1970). And as Chief Judge David Bazelon noted in Anderson v. Laird, 151 U.S.App.D.C. 112, 466 F.2d 283 (1972), wherein compulsory chapel attendance at service academies was held violative of the establishment clause of the First Amendment: "individual freedom may not be sacrificed to military

9. It was held in *Bilick* that politically motivated arrests, on drug offenses, were improper. The fact that the plaintiffs in this case were arrested on charges which might not carry the same stigma as those in *Bilick*, does not diminish the potential for adverse effects plaintiffs might later encounter.

10. Although the Court need not pass upon the propriety of mandamus jurisdiction, having concluded that § 1331(a) has been satisfied, the issue is worthy of brief consideration. There is no quarrel with the government's contention that mandamus may only properly compel an official to perform a non-discretionary duty. Coleman v. Burnett, 477 F.2d 1187, 1202 (D.C.Cir.1973) ; Burnett v. Tolson, 474 F.2d 877, 880 (4th Cir. 1973).

However, the mere categorization of a duty as discretionary does not, in and of itself, foreclose judicial inquiry. Courts have acknowledged that command discretionary authority is not without limits and that mandamus jurisdiction may be invoked to cure action which transgresses the reasonable or rational exercise of discretion or which is arbitrary. See e. g. Burnett v. Tolson, *supra;* Feliciano v. Laird, 426 F.2d 424 (2d Cir. 1970) ; United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371, (2d Cir. 1968). As will be later demonstrated, the Court has concluded that the Base Commanders had indeed exceeded the proper discretionary boundaries created by the regulations in question and·constitutional obligations which may not be ignored.

interests to the point that constitutional rights are abolished." 466 F.2d at 295.

This issue was most recently addressed in this Circuit in Avrech v. The Secretary of the Navy, 477 F.2d 1237, (1973). A unanimous court, through an opinion authorized by Mr. Justice Clark sitting by designation as a Circuit Judge, there held unconstitutional the "General Article" of the Uniform Code of Military Justice. That provision made punishable by court martial "all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces . . . ."

Although Avrech, who sought to declare invalid his court martial conviction, raised First Amendment contentions, the Court ruled that the Article's failure to give fair notice as to punishable conduct was violative of the Fifth Amendment, and on that ground voided the Article.

The *Avrech* court did, however, indicate that general constitutional guidelines are appropriate to military/constitutional issues:

> "The government says further that civilian standards of specificity do not apply to the military. We have concluded that they do." 477 F.2d at 1243.

Justice Clark then specifically followed the previously noted test promulgated in *Kauffman*.[11]

It appears that it is this Court's responsibility to initially determinate whether or not Air Force Regulation 30–1(9), and the procedures followed pursuant thereto, meet appropriate First Amendment standards. If such standards are not met it is then incumbent upon the military, in order to preserve the Regulations, to demonstrate that the needs and demands peculiar to that institution necessitate the deviation from otherwise controlling principles. It is the view of this Court that the Regulation cannot withstand either inquiry and must therefore fall.

At the outset, it is important to recognize that the activity here involved falls classically within the framework of First Amendment protection. Indeed, Air Force Regulation 30–1(9) evidences the military's recognition of the right of members to petition public officials. In this instance, the circulated petition was restrained in tone and certainly incapable of being construed as advocating illegal or disruptive activity. Plaintiffs attempted to express their views on a subject of general concern to those being solicited. But more was involved—the petition was not merely a statement of opinion or advocacy—it was a plea to our nationally elected officials, imploring them to exert authority to end a conflict which at the time was being hotly debated as to its morality, purpose and consequences. To assume, or expect, that members of our Armed Forces, wherever stationed, would not or should not question the basic premises and rationale underlying the war our nation was then involved in, and in which these plaintiffs were actually participating, would be a disservice to their character and intelligence.

The non-military community treats the activities here in question as common place, and there can be no doubt that, military consideration aside, any government attempt to prevent, restrict or impede that mode of conduct would not be judicially tolerated.

■ Plaintiffs have challenged the validity of a military procedure which clearly amounts to a system of prior restraints placed upon activities which even the Air Force recognizes as valid. An underlying principle of our government is that prior restraints imposed upon the exercise of First Amendment activity are viewed with disfavor. As the Supreme Court held in New York

---

11. Justice Clark proceeded to reject the military's argument that, through years of interpretive precedent, the Article had taken on sufficient clarity and meaning to weather the charge of its being invalidly vague.

Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) quoting from Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963):

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."

More closely analogous to this suit is the ruling in Shuttlesworth v. City of Birmingham, 394 U.S. 147 at 150, 89 S.Ct. 935 at 938, 22 L.Ed.2d 162 (1969).

". . . a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional."

*Shuttlesworth* overturned a conviction under a city ordinance making it illegal to parade without first securing a license from city officials. The law directed that a license shall be issued' unless, in the judgment of the local authorities, "public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused."

Plaintiffs contend that the standards pertinent to AFR 30–1(9) as found in AFR 35–15, cannot survive scrutiny under the *Shuttlesworth* test. They claim that the standards—"clear danger to the loyalty, discipline or morale of members or material interference with the accomplishment of the military mission"—offer little or no guidance to Commanders who must pass on petitioners' request.[12] The Court agrees.

These guidelines, in fact, provide no substantive standards at all, and, as the facts and circumstances surrounding this litigation so strikingly reveal, easily permit discriminatory and arbitrary application. Several courts have very recently had occasion to examine the adequacy of military standards regulating activities of their members. In *Avrech*, the terms "all disorders and neglects to the prejudice of the good order and discipline in the armed forces" and "all conduct of a nature to bring discredit upon the armed forces" were held to be unconstitutionally vague. Judge Robinson in *Stolte*, observed:

"that the word 'disloyal' is inherently ambiguous and ill-suited to proscriptive use, especially where First Amendment rights are involved. It is not a word of easily defined meaning and common understanding such that no further standard is necessary. 'Measures which purport to define disloyalty must allow [knowledge of] what is and is not disloyal.' Baggett v. Bullitt, 377 U.S. 360, 380 [84 S.Ct. 1316, 1327, 12 L.Ed.2d 377] (1964)." 353 F.Supp. at 1398.

The provisions of AFR 35–15 are equally ambiguous and vague, leaving to the commander an excess of discretion.

### Action Complained Of

On December 9, 1971, in a written request to Colonel Fitzgerald, the then Commander of Cam Ranh Air Base, plaintiffs Randig and Daniels sought permission to solicit signatures on the petition and detailed the following re-

---

12. Although the Regulations are challenged, in part for their alleged vagueness, it should be noted that a traditionally recognized hazard which flows from impermissibly vague statutes —the failure to afford the citizenry adequate and fair notice as to what is impermissible and punishable conduct—is not a relevant consideration in this suit. Air Force Regulation 30–1(9), presumably punishable under Art. 92 of the UCMJ, 10 U.S.C. § 892, for failure to obey "any lawful general order or regulation," establishes a blanket ban on "public solicitation" of congressional petitions without first obtaining command approval. To that extent, 30–1(9) certainly provides adequate notice to airmen desirous of petitioning—they simply cannot do so without prior authorization. The requirement is clear. But vague statutes, and those which, by reason of such vagueness become overly broad in their application, are also inherently defective by providing less than adequate guidelines for their administration, thereby posing "dangers of arbitrary and discriminatory application" Grayned v. City of Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). See also Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); Stolte v. Laird, 353 F. Supp. 1392, 1400 (D.D.C.1972).

strictions and conditions which they would observe:

1. The solicitation would be during off duty hours;
2. There would be no interference with the performance of duties of other military personnel;
3. No government material would be used;
4. No one would be coerced into reading or signing the petition;
5. The soliciting would be conducted only by a designated and identified group of servicemen.[13]
6. Solicitation would take place only in living areas;
7. Solicitors would be out of uniform;
8. The activity would not take place at entrances or exits of base exchanges, clubs, snack bars, etc., in an effort to avoid interference with pedestrian and vehicular traffic;
9. No literature would be posted announcing the petition;
10. No stands would be used;
11. Military courtesy would be honored.

In an immediate reply also dated December 9, 1971 Colonel Fitzgerald informed those plaintiffs:

"Having carefully reviewed, pursuant to paragraph 9, AFR 30–1 your request for permission to solicit signatures on a petition at Cam Ranh Bay Air Base, and having carefully reviewed the contents of the petition, I hereby deny your request."

Colonel Fitzgerald's reply offered no specific reasons or findings for denial. And it was only during the course of this litigation, in response to interrogatories propounded by plaintiffs, that justifications for the denial were supplied. The Colonel there stated that his refusal was based on his belief ". . . that the proposed petition presented a clear danger to the loyalty, discipline and morale of military personnel assigned to the base."[14] In response to inquiry as to the standards used in making such a determination he added:

"I relied on the standards, criteria and factors in Air Force Regulations 30–1 and 35–15. The proposed solicitation presented a clear danger of material interference with the accomplishment of the mission in Vietnam by seeking disaffection on the part of military personnel in Vietnam with the effort they were there to support."[15]

The justification, therefore, amounted to a near parroting of the Regulation's broad standards. Furthermore, since Colonel Fitzgerald assured plaintiffs in his December 9, 1971, refusal that their request had been "carefully reviewed," it must be presumed that the conclusion drawn, and later expressed, took into account the detailed restrictions which the plaintiffs offered to observe.

It is also significant to note that Fitzgerald, acting as an official to whom the Regulations were addressed, interpreted Regulations 30–1 and 35–15 as not requiring of him a statement setting forth the reasons for a denial.[16] Considering the nature and tone of the petition, the self-imposed proscriptions included within the request, as well as the purported reasons for denial, it is reasonable to assume that if Fitzgerald could validly deny that request, any petition which even as much as hinted at the controversial nature of the war would be rejected out of hand. This not only makes a mockery of First Amendment guarantees, it renders the right to petition, theoretically reinforced in its protection under AFR 30–1, almost meaningless.

13. The letter was written and signed by only Randig and Daniels, it did, however, request permission for four other airmen.

14. Answers to Interrogatories by defendant, F. Paul Fitzgerald, dated December 6, 1972 at 2.

15. *Id.* at 3.

16. *Id.*

Colonel Gunn, Commander of Tan Son Nhut Air Base, who acted upon plaintiff Carlson's request, reacted in a similar manner. In a letter dated October 20, 1971 to Carlson's attorney he merely indicated that he adhered to his deputy's decision to refuse permission to solicit.[17] The next month, in a communication to the Director of the American Civil Liberties Union, who inquired into the matter, Colonel Frank O. House, the Director of Civil Law, Office of the Judge Advocate General, enlarged upon the basis for Gunn's action with reference to Department of Defense Directive 1325.6, the subject of which is entitled "Guidelines for Handling Dissident and Protest Activities Among Members of The Armed Forces," as well as AFR 30–1 and AFR 35–15. He explained that the refusal was based on the Commander's determination:

". . . that, under the circumstances, . . . Carlson could not be permitted to engage in partisan political activities on the base by attempting to induce others to sign petitions addressed to the Congress . . . (and that) . . . the solicitation of signatures by . . . Carlson on a United States military installation located in a foreign country and under wartime conditions could constitute a danger to the loyalty, discipline, and morale of personnel . . . and could interfere with mission effectiveness." [18]

The responses of Colonel Gunn to plaintiffs' interrogatories, in addition to confirming Colonel House's statement that Directive 1325.6 as well as the two Air Force Regulations were determinative, give the following reason for not permitting Carlson to solicit:

"The circulation of such a petition on a South Vietnamese installation, in an active war zone, at a time when harmony between ourselves and our South Vietnamese allies was crucial to the President's program of 'Vietnamization,' would have been manifestly mission dangering. It would have posed a clear threat to the discipline and morale of all United States Servicemen who were engaged in the mission, as repeatedly defined by the President, of steadfastly supporting the South Vietnamese in their struggle for national survival." [19]

*Reviewability*

The government argues that this Court should adopt the oft cited "hands off" doctrine and accept the determinations made by the military as being reasonably and properly within their au-

---

17. The record does not indicate if the attorney's written request contained any proposed restrictions similar to those listed by Randig and Daniels.

18. Letter from Colonel Frank O. House, USAF, Director of Civil Law, Office of Judge Advocate General to Melvin L. Wulf, Legal Director, American Civil Liberties Union, dated November 29, 1971. It is noted, of course, that this communication and explanation was not made by the Base Commander and is merely an interpretation of his decision.

This Directive, in pertinent part, which adds little or no clarification to the vague guidelines of the two Regulations in question, provides as follows in Part III A 1:
"A Commander is not authorized to prohibit the distribution of a specific issue of a publication distributed through official outlets such as post exchanges and military libraries. In the case of distribution of publications through other than official outlets, a Commander may require that prior approval be obtained for any distribution on a military installation in order that he may determine whether there is a clear danger to the loyalty, discipline, or morale of military personnel, or if the distribution of the publication would materially interfere with the accomplishment of a military mission. When he makes such a determination, the distribution will be prohibited."

19. Answers of defendant Charles D. Gunn, Jr., to plaintiff's first interrogatories, dated January 9, 1973 at 5.

In a supplemental affidavit of May 24, 1973, Colonel Fitzgerald also noted the effect the petitioning would have upon our "host" country as well as his fear that the petitioning would jeopardize the morale and effectiveness of the security police servicemen at a time when there were morale and discipline problems on Base.

thoritative discretion, and that any abridgement of the First Amendment caused by the two Regulations, as applied to the incidents involved in this case, were justified. *Cf.* Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L. Ed. 842 (1953); Raderman v. Kaine, 411 F.2d 1102 (2d Cir. 1969). It is recognized that servicemen may indeed be limited in their exercise of First Amendment rights as Judge Friendly in Cortright v. Resor, 447 F.2d 245, 252 (2d Cir. 1971), observed:

"So ardent an advocate of a broad reading of the First Amendment as Professor Thomas Emerson has written, 'to a certain extent, at least, the military sector of a society must function outside the realm of democratic principles, including the principle of freedom of expression' and 'members of the armed forces, at least when operating in that capacity, can be restricted in their right to open discussion.' Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 935–36 (1963)."

However, when constitutional rights are at stake this Court need not blindly accept all military determinations. Rather, the proper judicial role is to review the challenged procedure in view of both military demands as well as individual freedoms. The observation of Justice Douglas, in O'Callahan v. Parker, 395 U.S. 258, 265, 89 S.Ct. 1683, 1687, 23 L.Ed.2d 291 (1969), made in connection with an analysis of the procedures followed in military courts which were less favorable to defendants than those practiced in civilian courts, is apropos:

". . . the justification for such a system rests on the special needs of the military, and history teaches that expansion of military discipline beyond its proper domain carries with it a threat to liberty."

20. Judge Russell, in holding the regulation to be satisfactorily clear and definite, found the following:
"The regulation must be read, however, in conjunction with the opinion of the Judge

The approach to constitutional-military confrontations utilized in *Avrech, Stolte* and *Kauffman* reflects the need to preserve and accommodate both of these often-conflicting interest. Rote adherence to determinations and policies characterized by the military as falling uniquely within its sphere of expertise, however, leaves little room for accommodation and the Court will neither accept nor follow that argument.

## *The Merits*

As noted earlier, the imposition of prior restraints by governmental bodies upon First Amendment right of free expression has been greatly restricted and controlled. They have been held to be totally invalid, New York Times v. United States, *supra,* or, when permitted, have been required to provide adequate procedural safeguards designed to prevent arbitrary and capricious impediments to permissible activities. Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Shuttlesworth v. City of Birmingham, *supra.*

The Federal courts, however, have had little opportunity to review military procedures of prior approval. One case which affords substantive treatment of such a system, and upon which defendants heavily rely, is Dash v. Commanding General, Fort Jackson, South Carolina, *supra.* The district court there held that the Commander of Fort Jackson could properly promulgate a regulation banning the distribution of printed matter unless first approved. Although the regulation contained no guidelines which were to be followed, the court found that, read in conjunction with an opinion of the Army Judge Advocate, sufficient standards existed to enable the procedure to withstand the constitutional challenges of vagueness and overbreadth.[20] Before reaching that

Advocate instructing authoritatively the Post Commander in the exercise of his powers under AR 210–10, paragraph 5–5e. By these instructions, the Post Commander is required to make specific findings in sup-

conclusion, and after reviewing the precedents establishing that Federal courts should avoid interference with and control over military activities, the Court aptly noted:

"Despite the absence of any specific decisional authority on our specific issues, it would appear plain from the foregoing general principles that, within certain limits, the military establishment should have authority to restrict both the distribution of printed materials and the holding of public discussion meetings on post. The right to restrict, however, must no doubt be kept within reasonable bounds; it is not, and cannot be, a completely limitless power. And, however, hesitant they may be to 'intrude', Courts will be available to determine whether there is a reasonable basis for such restrictions as may be placed on the serviceman's right of free speech by the military establishment." 307 F.Supp. at 854.

The result reached in *Dash* is based upon facts which are distinguishable from those presented here. In *Dash* it was specifically highlighted that the authority to prohibit distribution had never been invoked—there was no issue of whether the commander had properly exercised his power. Those circumstances are simply not comparable to the ones here involved, as previously described. The possibility of the abuse of command discretion, as acknowledged by the trial court in *Dash*, became a reality when Colonels Gunn and Fitzgerald curtly dismissed plaintiffs' request to engage in activity clearly worthy of constitutional

protection. Furthermore, *Dash* did not involve a serviceman's petition to Congress, a right which, as previously noted, the Air Force professes to uphold and which, although defendants dispute its relevancy, has been specifically incorporated into and reinforced by the United States Code.

The Court, therefore, finds the circumstances, and factual development recorded in this case to be sufficiently distinguishable from *Dash* to permit it to comfortably reach an opposite conclusion.

The government attributes much to the fact that the incidents in question occurred in a combat zone, thereby justifying the standards of AFR 35–15 as well as specific actions taken by the military commanders. Their position viewed in light of the *Kauffman* criteria, is that the exigencies and considerations attendant to and surrounding combat zone military operations, as they relate to discipline, morale and effectiveness of mission, present "conditions peculiar to military life" so as to warrant a support of AFR 35–15 and its specific applications in this suit. The following abstract, taken from the defendants, brief, succinctly states that position: ". . . in the context of a military installation where personnel are actually participating in the war plaintiffs regard as unjustifiable and possibly unlawful, there can be no doubt that the likely result would be discontent and destruction of the loyalty among the servicemen on such an installation at whom plaintiffs' message was presumably aimed".[21] Supportive documentation, sup-

port of any restriction imposed by him under the Regulation. Specifically, he is advised against any denial based on 'good taste' or 'in the best interests of the command' and is instructed that he may delay distribution of a publication 'only if he determines that the specific publication presents a clear danger to the loyalty, discipline, or morale of his troops.' He is commanded that he 'may not prevent distribution of a publication simply because he does not like its contents' and '[t]he fact that a publication is critical—even unfairly

critical—of Government policies or officials is not in itself, a ground for denial.' The constitutionality of the regulation must be determined on the regulation as construed and defined in these instructions issued by the Judge Advocate, controlling the application by the Post Commander of the regulation." 307 F.Supp. at 855.

21. Memorandum of Points and Authorities In Support of Defendants' Motion For Summary Judgment And In Opposition To Plaintiffs' Motion For Summary Judgment at 18. The

plied through the affidavits of Fitzgerald and Gunn, seek to demonstrate that the setting and military climate were such that the command action was both reasonable and crucial to the maintenance of moral and discipline which, in turn, bore upon successful mission accomplishment.[22]

These after the fact appraisals, however, viewed in light of applicable First Amendment principles as they have been most recently developed in both military and civilian courts, provide insufficient justification for the choking of fundamental rights of servicemen.

In United States v. Priest, 21 U.S.C. M.A. 564, 45 CMR 338 (1972) the United States Court of Military Appeals, reviewed the conviction under the now defunct "General Article," for "printing and distributing, with intent to promote disloyalty and disaffection among members of armed forces," of a naval enlistee who had circulated an underground newspaper severly critical of American policies and activities in Vietnam. The panel affirmed the conviction, but in so doing significantly held:

"The proper standard for the governance of free speech in military law is still found, we believe, in Mr. Justice Holmes's historic assertion in Schenck v. United States (citation omitted), that:

'. . . The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.'" 21 U.S.C.M.A. at 570.

The military court concluded that the statements disseminated by Priest, unquestionably more inflammatory than the petition at issue here, "tended palpably and directly to affect military order and discipline . . . ." 21 U.S.C. M.A. at 572.[23] The court in *Stolte, supra,* followed this approach and ruled

---

Court notes that the quoted characterization of the plaintiffs' petition is not totally accurate in that there was no reference to the war's justifiability or legality.

22. As Col. Fitzgerald stated by affidavit of May 24, 1973:

"To officially permit dissident individuals to circulate a petition which advocated disregard and disrespect for the U. S. mission in Vietnam, would, in my judgment have seriously lowered the morale and status of discipline in the command, jeopardized security, and adversely affected fulfillment of our mission. I was particularly concerned about the probable affect on the approximately 1000 security police who were responsible for guarding the base from enemy attack 24 hours a day. To demand of them that they set the example in terms of obedience, self-discipline and faithful fulfillment of special orders pertaining to conduct, discipline and security, and simultaneously permit ·the circulation of an anti-war petition, I considered to be imprudent. Should these security forces have become disenchanted with their overall mission, which was certainly the objective of those desiring to circulate the petition, it was obvious to me that the security of Cam Ranh Bay Air Base would have been directly and seriously jeopardized. The security of the installation depended to a very great extent on each security policeman maintaining a positive attitude toward the particular mission of the base and the war in general. Since these personnel were young, and in my opinion impressionable, every precaution had to be taken to prevent their disaffection and to encourage high morale, for the benefit of the mission and the security of the base, and the safeguarding of the lives of the personnel, and protection of the property situated there."

It appears, therefore, that Fitzgerald was primarily concerned with the reaction of other servicemen, as manifested in an erosion of morale and discipline with the interference of the mission flowing therefrom. He does not appear to be saying, as he probably could not say in view of the proposed restrictions that the gathering of the signatures *per se,* would hinder military operations.

23. The underground newspaper printed and distributed by Priest clearly encouraged resistence to participation in the war; advocated violence as a means of bringing the war to a halt; and portrayed the United States as an aggressor committing horrendous crimes "against a peasant people fighting to expel foreign oppressors from their homeland." Reprinted at 21 U.S.C.M.A. at 566.

that any prejudicial effect upon morale, or discipline must be "palpable," and "not merely in an indirect and remote sense." [24] 353 F.Supp. at 1401 n. 35, quoting from 21 U.S.C.M.A. at 569.

Fitzgerald's barebone assertions are clearly insufficient, even as they have been elaborated upon as a result of this litigation, when considered against the *Priest* and *Stolte* criteria. It is difficult to find, despite the particular circumstances under which Col. Fitzgerald was operating, that the peaceful and restricted solicitation of the petition could pose a palpable and direct threat to the proper military bearing required at Cam Ranh Bay.[25] As elsewhere indicated, to do so would not only be unrealistic, it would be insulting to our servicemen.[26] The plaintiffs did not intend to hawk inflammatory rhetoric from the street corner, to advocate disruptive or unlawful conduct, nor did they seek to interrupt or in any way interfere with legitimate military operations and activities on base. Their aim was not to discredit the Vietnamese and one would be hard pressed to demonstrate that such would result from the petition. They made no

attempt to counsel fellow servicemen to drop their arms or abandon their military mission. Fitzgerald's fear that the security forces would be unduly influenced by the petition, to the point of endangering the operations delegated to base personnel, appears to have been no more than an unfounded conclusion which did not adequately consider his men's right to petition Congress in the requested manner. The Court does not levy criticism at military commanders whose job is to perform their duties with the highest degree of effectiveness and proficiency, and the Court has been offered no proof that Colonels Gunn and Fitzgerald were not acting in the best of faith when they denied plaintiffs requests. Military authority is not trained or attuned to the sensitivity involved in questions relating to First Amendment rights. It is quite understandable, therefore, that when confronted with regulatory language, as that found in the two Regulations, where acknowledged constitutional rights are tempered by such laudable yet amorphous terms as "morale," "loyalty" and "discipline" the commander will favor

---

24. See discussion in *Stolte* of the difficulty in determining what will detrimentally affect "morale." 353 F.Supp. at 1403–04.

25. In this vein the *Priest* court noted:
 "Dependable morale and discipline must be erected on something more substantial than fear of punishment or a conditioned reflex. The level of intelligence and education of members of the armed forces today is higher than ever before in our history. We have firm confidence that the motivation of the overwhelming majority is not so fragile that it could be shattered by the reading of the publications that are the subject of this case." 21 U.S.C.M.A. at 571.
 They did proceed to hold, however, that the distribution of the inflammatory language, by encouraging illegal activities, might well have damaging results.

26. Defendant Carlson has stated that he had collected signatures on a Naval installation while in Vietnam at approximately the same time period he was arrested at Tan Son Nhut Base. Interrogatories Directed To Plaintiff James Edward Carlson And Answers Thereto, February 6, 1973 at 2–3.
 There is no indication in the record that such solicitation adversely affected morale or dis-

cipline, impeded the successful functioning of military operations, or that Naval authorities sought to prevent the activity on those grounds.
 The Court also takes cognizance of the fact that servicemen, stationed both at home and abroad (including Vietnam), have had relatively easy access to publications which carry material far more critical of the Southeast Asian conflict than that contained in plaintiffs' petitions. The Court requested and received from the Army and Air Force Exchange Service a current list of periodicals which are stocked in the Exchanges and which were "not unlike the assortments previously made available in Vietnam." Included are: Harpers, Atlantic Monthly, New York Magazine, Esquire, National Lampoon, Newsweek, Time, and U. S. News & World Report. Servicemen were, therefore, exposed to divergent views on many aspects of the war issue through military controlled outlets, further highlighting the unlikelihood that circulation of the petition would endanger military morale or discipline. August 20, 1973, letter from Colonel Harry H. Elmendorf, Director, Command and Public Relations Division, Army and Air Force Exchange Service.

and make determinative the military considerations. For this reason alone those Regulations must carefully and precisely counsel command personnel as to when and under what situations they may limit expressional freedoms. The Regulations, as they presently exist, do not offer proper guidance, thus allowing for their overbroad application which may cause and, as this case exemplifies, have caused unwarranted curtailment of lawful and permissible conduct.

The Court further notes, partially in response to defendants' emphasis upon the fact that the activity took place in a zone of combat, the comments of the *Avrech* Court, which although made in the context of a discussion of the necessity and applicability of the "General Article" in Vietnam, is nonetheless pertinent:

> "The Government, however, questions the application of Supreme Court standards to military personnel stationed in a combat zone. We readily understand its apprehension, but the argument is beside the point because there are Articles other than Article 134 that fully and satisfactorily govern combat situations. Two Articles, 92 and 99 . . . punish failure to *obey any lawful order or regulation* and misbehavior before the enemy, respectively." 477 F.2d at 1244.

It is the Court's ruling that Air Force Regulation 30–1(9) is facially unconstitutional in that it represents an impermissibly vague and standardless restraint upon the exercise of First Amendment rights.

Since 30–1(9) has been voided, it follows that the arrests of Carlson and Randig for failure to follow that regulation must be declared illegal. Accordingly, the proper military authorities shall expunge and destroy any reference maintained of such arrests and shall be enjoined from distributing the same to any civilian or military authority, and if there has been such distribution, corrections shall be made and communicated immediately to such authority. Bilick v. Dudley, *supra*.

Counsel for the plaintiffs shall submit within ten (10) days an appropriate order.